**UNITED STATES of America,
Plaintiff,**

v.

**Pradeep SRIVASTAVA, Defendant.**

**Criminal No. RWT 05–0482.**

United States District Court,
D. Maryland,
Southern Division.

Aug. 4, 2006.

Paula M. Junghans, DLA Piper Rudnick Gray Cary U.S. LLP, Washington, DC, for Defendant.

Stuart A. Berman, Office of the United States Attorney, Greenbelt, MD, for Plaintiff.

## OPINION

TITUS, District Judge.

On March 20, 2003, Magistrate Judge William Connelly signed three search warrants that authorized the search of Defendant Pradeep Srivastava's home and two medical offices for "financial, business, patient and other records related to" his "business ... which may constitute evidence of violations of Title 18 U.S.C. § 1347," a statute prohibiting health care fraud. Execution of these warrants resulted in the seizure of extensive financial

papers, both business and personal, some of which were referred to the Internal Revenue Service ("IRS") for investigation. Upon further inquiry, the IRS concluded that Dr. Srivastava had failed to properly file his personal income tax returns for tax years 1998–2000. On October 12, 2005, a grand jury returned an indictment [1] charging Dr. Srivastava with income tax evasion and false statements on tax returns.[2]

On January 21, 2006, Dr. Srivastava filed a Motion for An Evidentiary Hearing Pursuant to *Franks v. Delaware* and to Suppress Evidence [Paper No. 13], alleging that the search warrant affidavit distorted and omitted material information, misleading Judge Connelly to authorize a warrant "under which sweeping and impermissible general searches of [his] home and offices were conducted." Dr. Srivastava requested that the Court conduct an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 155–56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), and suppress the evidence seized in the searches. For reasons stated on the record on March 27, 2006, this Court denied Defendant's request for a *Franks* hearing. The Court heard further argument and testimony on the remaining issues raised in Dr. Srivastava's Motion to Suppress on June 9, 2006. For the reasons stated below, Dr. Srivastava's Motion to Suppress will be granted.

## BACKGROUND

Dr. Srivastava is a cardiologist residing in Potomac, Maryland. At all times relevant to this indictment, he conducted his medical practice through his professional corporation, Pradeep Srivastava, M.D., P.C., a Subchapter S Corporation. He filed Form 1040 U.S. Individual Income Tax Returns jointly with his wife and Form 1120–S U.S. Income Tax Returns for his subchapter S corporation for his medical practice.[3] Dr. Srivastava invested a significant amount of money in the stock market, specifically in stocks and stock options. During the rapidly rising market in technology stocks of the late 1990s, Dr. Srivastava traded in stocks and stock options at a high volume and apparently earned substantial capital gains, with smaller accompanying capital losses.

The investigation that ultimately led to criminal tax charges against Dr. Srivastava initially focused on allegations that he, through his medical practice, was engaged in health care fraud. Special agents from the Department of Health and Human Services, Office of Inspector General ("HHS–OIG"), the Federal Bureau of Investigation and the Office of Personnel Management, Office of Inspector General conducted the initial stages of the health care fraud investigation of Dr. Srivastava. On March 20, 2003, Special Agent ("SA")

---

1. Count I of the indictment alleges that Dr. Srivastava filed an individual income tax return for 1998 on which Schedule D, Capital Gains and Losses, claimed a short-term capital loss of approximately $(826,591) rather than actual short-term capital gains totaling approximately $779,397.00, and filed an income tax return misstating the amount of taxable income and tax due. Count II of the indictment alleges that Dr. Srivastava filed a tax return in 1999 on which Schedule D, Short Term Capital Gains and Losses, reflected a short-term capital loss of $(990,-288.00) rather than the actual short-term capital gain of $41,408,740, and accordingly filed

a false income tax return that year reflecting a much diminished taxable income and amount of tax due. Finally, Count III of the indictment alleges that Dr. Srivastava filed an individual income tax return for 2000 that omitted certain short-term capital losses.

2. The government ultimately chose to proceed with civil enforcement regarding the health care fraud issues.

3. As required by law, Dr. Srivastava included income from his medical practice professional corporation on his joint individual tax returns.

Jason Marrero of HHS–OIG submitted a single affidavit in support of applications for three search warrants to Judge Connelly. The affidavit in support of the warrants included allegations that Dr. Srivastava billed for services not rendered to patients, billed patients for duplicate services, listed inappropriate codes on patient claims, improperly billed patients for incidental services, and/or altered medical records.

Judge Connelly approved all three warrants, two of which applied to Dr. Srivastava's medical offices in Greenbelt and Oxon Hill, and the third of which authorized a search of Dr. Srivastava's residence in Potomac. Each warrant contained identical substantive language that authorized the seizure of ten categories of records, "including but not limited to, financial, business, patient, insurance and other records *related to the business* of Dr. Pradeep Srivastava, to include Drs. Balnath Bhandary and Felipe Robinson, for the period January 1, 1998 to Present, *which may constitute evidence of violations of Title 18, United States Code, Section 1347.*"[4] (emphasis added) In pertinent part, the warrants specifically authorized the seizure of:

2. *Financial records,* including but not limited to accounting records, tax records, accounts receivable logs and ledgers, banking records, and other *records reflecting income and expenditures of the business.*

(emphasis added) Agents simultaneously executed these warrants on March 21, 2003.

Agents executing these warrants seized large volumes of information from Dr. Srivastava's offices and his home.[5] Of particular relevance to this case and the instant motion, agents seized from Dr. Srivastava's office copies of facsimile transmission

4. Section 1347 provides that, "[w]hoever knowingly and willfully executes, or attempts to execute, a scheme or artifice—

(1) to defraud any health care benefit program; or
(2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services,

shall be fined under this title or imprisoned not more than 10 years, or both. If the violation results in serious bodily injury (as defined in section 1365 of this title), such person shall be fined under this title or imprisoned not more than 20 years, or both; and if the violation results in death, such person shall be fined under this title, or imprisoned for any term of years or for life, or both." 18 U.S.C. § 1347.

5. The government lists 25 financial records it plans to introduce into evidence at trial: (1) spreadsheet detailing options transactions on Bentley–Lawrence ("BL") account; (2) spreadsheet detailing stock transactions on BL account, labeled "corporate"; (3) spreadsheet detailing options transactions on Speer Leeds account; (4) spreadsheet detailing stock transactions; (5) schedule of realized gains and losses; (6) form 1099 activity detail for BL account; (7) form 1099 activity detail for BL account; (8) form 1099 activity detail for BL account; (9) fax from CPA requesting information to prepare tax return; (10) tax reporting statement to support capital gains; (11) form 1099 activity detail supporting capital gains; (12) handwritten bank interest and payments statement; (13) tax reporting statement to support capital gains; (14) form 1099 activity detail to support capital gains; (15) fax to CPA detailing BL accounts; (16) form 1099 activity detail supporting capital gains; (17) tax reporting statement to support capital gains; (18) form 1099 activity detail to support capital gains; (19) tax reporting statement to support capital gains; (20) fax from CPA requesting items to complete tax return; (21) handwritten list of dividends and interest from bank accounts; (22) tax reporting statement to support capital gains; (23) tax reporting statement to support capital gains; (24) spreadsheet for capital gains; (25) email from stock broker detailing stock activity. *See* Paper No. 14 at 24.

letters directing wire transfers to his bank accounts with the Bank of India. Agents also seized from Dr. Srivastava's residence a facsimile transmission from a brokerage firm that appeared to list stock transactions for 1998, as well as spreadsheets from his financial records that showed capital gains of close to $40 million for tax year 1999.

After the searches were completed, SA Marrero forwarded to the United States Attorney's Office a copy of the Bank of India faxes found at Dr. Srivastava's Greenbelt location. The U.S. Attorney's office subsequently related this information to Supervisory Special Agent ("SSA") Brad Whites of the Wheaton, Maryland office of the IRS. On April 23, 2003, SSA Whites met with IRS Special Agent ("SA") Meredith Louden, and suggested to her that these faxes, which showed monies going to India, suggested a possible "FBAR" violation.[6] Acting upon this information, SA Louden contacted SA Marrero, who apprised her of the agents' discovery of the papers showing substantial wire transfers to India,[7] and informed her that, on

the copies of his 1999, 2000, and 2001 personal tax returns found at his residence, Dr. Srivastava had not checked the appropriate block on the Schedules B to acknowledge these foreign accounts. SA Marrero proceeded to fax SA Louden six pages of documents, which included copies of the wire transfers found by the seizing agents. SA Louden subsequently began an investigation into possible FBAR violations, which ultimately led to a formal investigation regarding possible tax fraud committed by the Defendant.

## MOTION TO SUPPRESS

■ Under the Fourth Amendment to the United States Constitution,

> [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

**6.** "FBAR" stands for Foreign Bank and Financial Accounts Report, a document that is required to be filed with the IRS if: (1) the filer was a U.S. person, defined as a citizen, a resident or a person in and doing business in the United States; (2) the U.S. person had a financial account or accounts that exceeded $10,000 during the calendar year; (3) the financial account was in a foreign country; and (4) the U.S. person had a financial interest in the account or signatory or other authority over the foreign financial account. *See* IRS Form TD F 90–22.1; 31 C.F.R. 103.

**7.** SA Louden testified during the suppression hearing that when she spoke with SA Marrero on April 23, 2003, he indicated that when he found the remittance slips to the State Bank of India "he wasn't sure what they meant or how to even read them." Louden Tr. 5:9–10. *See also* Louden Tr. 47:1–4 ("I mean it was very confusing[,] the HHS agent was not familiar with what a remittance slip looked like. He wasn't even sure if this was in rupees or

dollars. . . ."); Louden Tr. 56:11–17 ("They were really unsure of even what it was . . . they had never really—I got the impression they had never seen anything like this before and, you know, they were trying to let me know how do you read something like this."). This alleged confusion is somewhat belied by the memorandum prepared by Special Agent Louden for purposes of this hearing, however, as this memorandum indicates that during her April 23rd conservation with SA Marrero, he indicated that after he observed the Bank of India faxes, the Schedule Bs of Dr. Srivastava's 1999, 2000, and 2001 tax returns were consulted, and he noted that Dr. Srivastava failed to check the Schedule B to acknowledge the foreign bank accounts. This Court finds curious the fact that an individual allegedly uneducated and confused about the significance of overseas wire transfers would have the wherewithal to compare the remittance slips against tax forms to see if the taxpayer's Schedules B acknowledged the foreign bank accounts.

U.S. Const. Amend. IV; *United States v. Stevenson*, 396 F.3d 538, 545 (4th Cir. 2005). The so-called "Warrant Clause" of the Fourth Amendment "categorically prohibits the issuance of any warrant except one *particularly describing* the place to be searched and the persons or things to be seized." *Maryland v. Garrison*, 480 U.S. 79, 84, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987)(internal quotations omitted)(emphasis added).

■ The particularity requirement circumscribes officers' ability to conduct a general search; "by limiting the authorization to search to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." *Id.* at 84, 107 S.Ct. 1013. Therefore, the particularity requirement "prevents the seizure of one thing under a warrant describing another," and prevents "a general, exploratory rummaging" into a person's property by leaving nothing to the discretion of executing officers. *United States v. Janus Industries*, 48 F.3d 1548, 1553–54(10th Cir.1995); *see also Marron v. United States*, 275 U.S. 192, 196, 48 S.Ct. 74, 72 L.Ed. 231 (1927).

■ Subject to the exceptions discussed below, evidence seized outside the scope of a warrant must be suppressed. *See Weeks v. United States*, 232 U.S. 383, 392–94, 34 S.Ct. 341, 58 L.Ed. 652 (1914)(overruled on other grounds). In those circumstances where officers "grossly exceed the scope of a search warrant in seizing property," a search will be invalidated in its entirety, and all evidence seized will be suppressed. *United States v. Uzenski*, 434 F.3d 690, 706 (4th Cir. 2006). Such "blanket suppression is warranted where the officers engage in a 'fish-

ing expedition for the discovery of incriminating evidence.'" *Id.*

### I. Do the financial documents seized from Dr. Srivastava's residence and offices fall within the scope of the warrant?

■ Dr. Srivastava asserts that agents exceeded the scope of the warrant in conducting their searches and seizing certain financial documents. Noting that there must be some logical nexus between the items named in the warrant and any unnamed evidence seized during the search, *see, e.g., United States v. Gentry*, 642 F.2d 385, 387 (10th Cir.1981), Dr. Srivastava asserts that the documents seized that the government now seeks to use against him in its tax prosecution had no nexus to the business records listed in the warrant or to health care fraud. The government's position, taken in its opposition to Dr. Srivastava's motion and again at the evidentiary hearing before the undersigned, is that the warrant authorized agents to seize financial records that *either* related to the defendant's business *or* constituted evidence of violations of 18 U.S.C. § 1347.

The government's view of the scope of the warrants is simply untenable. The "Items to be Seized" listed by the warrant were defined as various categories of records *"related to the business of Dr. Pradeep Srivastava ... which may constitute evidence of violations of Title 18, United States Code, Section 1347."* (emphasis added) As such, agents were not entitled to seize *any* financial record of any kind, but rather could only seize documents that related to Dr. Srivastava's business *and* that may show in some way that health care fraud had been committed. This view is further supported by the fact that SA Marrero provided Judge Connelly with an affidavit supporting his suspicions that Dr. Srivastava, through his medical practice,

had engaged in health care fraud. These possible violations were the only things for which the government had probable cause to search. Accordingly, the warrants specifically delineated that they authorized the search and seizure of evidence *related to this subject matter* by specifying in the introduction of the warrant that agents were authorized to seize ten categories of documents "including but not limited to, financial, business, patient, insurance and other records related to the [medical practice] ... *which may constitute evidence of violations of ... Section 1347.*" (emphasis added) Therefore, in order to fall within the scope of the warrant, a financial record not only had to have some relationship to Dr. Srivastava's business, but it also was subject to the requirement that it may constitute evidence that health care fraud had been committed.

This is not an overly-technical view of this warrant.[8] In *United States v. Debbi,* 244 F.Supp.2d 235 (S.D.N.Y.2003), the District Court for the Southern District of New York reached such a conclusion in a case involving strikingly similar facts. In *Debbi,* a magistrate judge approved a warrant that authorized the seizure of various treatment records, claim records, financial records, etc., limited to items "in furtherance of: (1) obstruction of justice; (2) the commission of health care fraud and which relate to patients who are covered by Medicare and Medicaid insurance or patients who reside at adult homes." *Id.* at 236. In executing the warrant, the officers seized "numerous personal files (both elec-

8. It is true that courts in some cases courts have allowed the seizure of items not specifically described or delineated in the warrant. Many of these cases involve situations where the warrant(s) authorized the search for and seizure of drugs and/or weapons, and in the course of such searches, officers seized personal papers and effects. *See, e.g., United States v. Wardrick,* 350 F.3d 446, 453–54 (4th Cir.2003)(search warrant authorized seizure of firearms and related items; seizure of defendant's bills and other papers); *Armstrong v. State,* 548 S.W.2d 334, 336 (Ct.Crim.App.Tn.1977)(warrant for drugs; seizure of checks, bank documents, personal letters); *State v. McGuinn,* 268 S.C. 112, 232 S.E.2d 229, 230 (1977)(warrant for marijuana and drugs only; seizure of letters and photographs). In these cases, courts upheld the seizures of the personal documents on the theory that they were relevant in establishing proof of the defendants' residence in the location where contraband was found. *See, e.g., Wardrick,* 350 F.3d at 453(seizure of a utility bill, refund notice, and operator's license was proper because such items "constitute[d] evidence linking Wardrick to the premises where the illegal firearms were found."); *Armstrong,* 548 S.W.2d at 336 ("the personal documents were relevant in establishing proof of possession of the premises and ultimately the drugs."); *McGuinn,* 232 S.E.2d at 230 (*"Warden [v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967)] requires that there be a nexus between the items seized and some criminal behavior. The letters and photographs helped the police initially establishing who resided at the address ... [and] ... served as evidence of actual residency, which was essential in establishing possession and control of the marijuana.").

In this case, there is no such nexus between the financial documents seized from Dr. Srivastava's home and the items described by the warrant. *See Marron,* 275 U.S. at 198, 48 S.Ct. 74 (seizure of ledger and bills for gas, electric, etc., held not authorized by warrant to search for intoxicating liquors and articles for their manufacture). There is no suggestion on the government's behalf that the personal documents were seized to prove possession or ownership of the premises, as was the case in the above-mentioned cases. Furthermore, the government fails to illustrate how these personal financial documents in any way relate to the objects sought in the warrant. *Compare Gentry,* 642 F.2d at 387 (documents describing production of illegal drug seized during search but not listed in warrant had sufficient nexus to warrant, when warrant specifically named the illegal drug as the object of the search). Lacking this nexus, the Defendant's personal financial papers must be excluded as beyond the scope of the warrant. *See United States v. Jones,* 31 F.3d 1304, 1314 (4th Cir.1994).

tronic and paper), general correspondence, financial records, and records relating to Debbi's private patients, i.e., non-Medicare patients who do not reside in adult homes, not to mention numerous records of Mrs. Debbi." *Id.* at 236–37 (internal quotations omitted). Evaluating the Defendant's motion to suppress, the court observed

> [G]ood faith reliance on a Magistrate's determination of probable cause is no basis to ignore
>> the plain language of a warrant describing, as required by the Fourth Amendment, what is to be searched and seized; and what here saved the otherwise very broad warrant issued by the Magistrate Judge from overbreadth was its explicit command that the items to be seized be limited to evidence of either obstruction of justice or the commission of health care fraud.

*Id.* at 237. The court concluded that the materials seized from the Defendant's home, including "personal and religious files, general correspondence, family financial records, private patient records, etc . . . . plainly fell outside these parameters." *Id. Accord United States v. Duong,* 156 F.Supp.2d 564, 572 (E.D.Va.2001)(search warrant authorizing evidence relating to robbery plans didn't authorize seizure of personal financial and other papers). So too here, Defendant's brokerage statements, financial spreadsheets, faxes to his CPA, faxes to his bank, and other documents do not in any way relate to the subject matter of the warrant—health care fraud.[9]

■ The affidavit submitted in support of the warrants in this case detailed suspected health care fraud. This is the only subject for which the police had probable cause to search and seize evidence. *Ac-*

*cord Janus Industries,* 48 F.3d at 1553–54 (noting that the particularity requirement "ensures that a search is confined in scope to particularly described evidence relating to a specific crime for which there is demonstrated probable cause."). As the court in *Debbi* suggested, in a case where there is probable cause only to suspect health care fraud, a search warrant lacking this subject matter limitation would run afoul of the Fourth Amendment particularity requirement by allowing the seizure of *any* business record. *See Debbi,* 244 F.Supp.2d at 237; *see also United States v. Hickey,* 16 F.Supp.2d 223, 240 (E.D.N.Y. 1998)(in RICO case, the "unstructured mandates" of warrants authorizing officers to "search all of the business records of each of the defendant corporations and to seize any items that constituted evidence of *any* crime regardless of its nature" were "clearly violative of the Fourth Amendment."); *Coolidge v. New Hampshire,* 403 U.S. 443, 467, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (particularity requirement is designed to prevent "a general exploratory rummaging in person's belongings" by focusing the officer conducting the search on the items that are authorized to be seized at a designated location).

■ The fact that officers executing the search warrants in this case were faced with many personal records does not excuse them from complying with the restrictions and qualifications listed in the warrant. Other courts have observed that "the wholesale seizure for later detailed examination of records not described in a warrant is significantly more intrusive, and has been characterized as 'the kind of investigatory dragnet that the fourth amendment was designed to prevent.'" *United*

---

9. These items certainly had nothing to do with the facts sworn to in the affidavit and therefore should not have been seized. *See id.* ("[S]eized evidence arguably falling within the broad language [of the warrant] but unrelated to facts stated in the affidavit must be suppressed.").

*States v. Tamura,* 694 F.2d 591, 595 (9th Cir.1982)(citing *United States v. Abrams,* 615 F.2d 541, 543 (1st Cir.1980)); *accord United States v. Shilling,* 826 F.2d 1365, 1369 (4th Cir.1987)(acknowledging substantial practical problems presented by task of examining "the mass of [defendant]'s records," but noting that "we cannot easily condone the wholesale removal of filing cabinets and documents not covered by the warrant"). *Compare United States v. Sawyer,* 799 F.2d 1494, 1509 (11th Cir.1986)(in executing warrant for business records indicating scheme to defraud investors, agents carefully confined the search to scope of warrant; agents were instructed that personal records of individuals and other businesses should not be seized; during the search, agent reviewed items seized and determined a quantity of records not covered by the warrant and left them on the premises; employees were allowed to segregate and remove their personal items; documents seized consisted only of business records likely to reveal a pervasive scheme to defraud investors, as specified in the warrant).[10]

To be abundantly clear, the Court finds that the personal financial documents seized from Dr. Srivastava, including his personal bank accounts, spreadsheets reflecting his stock transactions, 1099 forms, etc., *see* Footnote 5, neither tended to show violations of the health care fraud statute, nor related to the business of Dr. Srivastava. At least one document arguably may have related to the business of

Dr. Srivastava—the fax to the Bank of India that was recovered from Dr. Srivastava's Greenbelt medical office. However, nothing about this document on its face connotes or suggests evidence of health care fraud. The only suggestion offered by the government that this fax fell within the scope of the warrant can be reduced to the argument that someone who commits health care fraud has to put the money *someplace,* therefore the document *could* show something related to the crime for which the warrant was sought. This justification is unacceptable, as there is no limiter to this interpretation. Under this view, *any* receipt, purchase order, bank statement, might be seized because it might show what Dr. Srivastava may have done with his allegedly illicit funds. This Court is unwilling to accept this limitless interpretation, which would allow the seizure of receipts showing the purchase of a family vacation, a motorcycle, even new articles of clothing as "evidence tending to show violations of 18 U.S.C. § 1347."

Additionally, the government's purported explanation that the agents were interested in the Bank of India faxes because they could possibly show "proceeds" of the alleged health care fraud is unavailing. The affidavit swore out facts suggesting that Dr. Srivastava billed for procedures that were not actually performed, engaged in "double billing" (billing separately for two procedures which should be billed under one code), and falsely diagnosed allegedly healthy individuals with certain cardi-

---

**10.** Even if this Court were sympathetic to the government's assertions that Defendant's business and personal records were commingled, this only gets the government past the first qualification listed in ¶ 2 of the warrant (that the records must relate to the business). As discussed above, the government utterly fails to provide a plausible explanation for how the records seized in any way suggested that they related to or suggested evidence of *health care fraud.* Furthermore, initial confu-

sion about the relevance of the documents does not justify their subsequent use against Dr. Srivastava when they are in fact outside the terms of the warrant. *See United States v. Altiere, III,* 2006 WL 515609 (N.D.Ohio March 1, 2006)(while initial seizure of documents not specifically delineated by the warrant may have justified initial seizure for review, the documents are not admissible against the defendant if they are beyond the scope of the warrant).

ac conditions that justified unnecessary treatment. There is not a single word in SA Marrero's affidavit relating to what Dr. Srivastava may have done with the monies he received as payment for his procedures, nor does the affidavit discuss how Dr. Srivastava handled his banking. In fact, the affidavit provided no probable cause to search for anything regarding how Dr. Srivastava's personal finances were handled. Furthermore, as counsel for the Defendant noted at the suppression hearing, concerns for proceeds of Dr. Srivastava's alleged crimes would involve *money laundering activities*, activities distinct from health care fraud, and evidence of which was not authorized by the warrant here.

This Court therefore finds that the seizure of the Bank of India faxes was not authorized by the warrant. While these documents may have legitimately appeared to be records of the business since they were found on the fax machine of one of Dr. Srivastava's medical offices and were sent on business letterhead, nothing about them could be seen as suggesting possible violations of 18 U.S.C. § 1347. Proceeds handling is not a crime that § 1347 describes, and the warrant simply did not authorize agents to seize anything related to money on the hope that it could show evidence of health care fraud.

Under the facts of this case, the government is stuck between the proverbial rock and a hard place. On one hand, if the warrant is read true to all of its terms and limitations, the agents were only allowed to seize records of the business that tended to evidence health care fraud violations—which Dr. Srivastava's personal and financial papers clearly did not. If, on the other hand, this Court were to accept the government's suggestion that the warrant should be read broadly to allow the seizure of virtually *any* financial document of the Defendant (business or otherwise), the scope of the warrant would become overbroad and violate the particularity requirement of the Fourth Amendment. This Court should construe a warrant in the most commonsense way, which limits the search/seizure to business records that tend to show health care fraud was committed. *Accord Debbi*, 244 F.Supp.2d at 237. This view is not only proper because it is the most sound reading of the warrant, but also because it is the only reading of the warrant that would allow it to be particular enough to avoid problems of overbreadth. Read in this way, the seizure of personal and financial non-business papers of Dr. Srivastava was not authorized by the terms of the warrant, and such evidence therefore must be suppressed unless it is within the scope of one of the exceptions discussed below.[11]

## II. Did seizing agents grossly exceed the scope of the warrant?

▮▮▮▮ Even if this Court were to find that some of the documents at issue here were within the scope of the warrant, these documents would be excluded as well

---

**11.** This Court is aware that officers may also seize articles of an incriminating character that they come across while performing a search in a given area pursuant to a valid search warrant. *See Uzenski*, 434 F.3d at 707. However, the government does not argue, nor can it be contended, that the personal, financial, and other documents seized from Defendant's home were of a readily incriminating nature. *See Horton v. California*, 496 U.S. 128, 136, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990)("It is ... an essential predicate to any valid warrantless seizure of incriminating evidence that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed. There are, moreover, two additional conditions that must be satisfied to justify the warrantless seizure. First, not only must the item be in plain view; its incriminating character must also be 'immediately apparent.' "); *see also United States v. Wells*, 98 F.3d 808, 809–10 (4th Cir.1996).

because the conduct of the agents who executed this warrant was so inappropriate as to warrant the exclusion of *all* evidence seized on March 21, 2003. As discussed above, the particularity requirement of the Fourth Amendment is designed to "prevent the seizure of one thing under a warrant describing another." *Marron,* 275 U.S. at 196, 48 S.Ct. 74. The Fourth Amendment also extends to the *execution* of search warrants, "such that officers cannot 'grossly exceed the scope of the search warrant in *seizing* property.'" (emphasis in original) *Uzenski,* 434 F.3d at 706, quoting *United States v. Foster,* 100 F.3d 846, 849–50 (10th Cir.1996)(internal citations and quotations omitted). "As a general rule, if officers executing a search warrant exceed the scope of the warrant, only the improperly-seized evidence will be suppressed...." *United States v. Squillacote,* 221 F.3d 542, 556 (4th Cir.2000). However, "[i]n extreme circumstances even properly seized evidence may be excluded when the officers executing the warrant exhibit a flagrant disregard for its terms." *Id.,* citing *United States v. Ruhe,* 191 F.3d 376, 383 (4th Cir.1999) (internal quotation marks omitted). "When law enforcement officers grossly exceed the scope of a search warrant in seizing property, the particularity requirement is undermined and a valid warrant is transformed into a general warrant thereby *requiring suppression of all evidence* seized under that warrant." *United States v. Medlin,* 842 F.2d 1194, 1198–99 (10th Cir.1988)(emphasis added); *see also Uzenski,* 434 F.3d at 706 ("Blanket suppression is ... appropriate where the warrant application merely serves as a general subterfuge masking

the officers' lack of probable cause for a general search ... or *where the officers 'flagrantly disregard[]' the terms of the warrant.*")(emphasis added).

SA Marrero clearly testified at the suppression hearing that he did not consider himself to be bound by the language of the warrant specifying that agents were to seize only evidence which tended to show violations of § 1347 *and* was a record of Dr. Srivastava's business. When questioned about his view of the warrant, and why he did not consider himself bound by the substantive introductory language that clearly circumscribed the legal scope of the agents' search, SA Marrero provided astonishing testimony in which he indicated that he inserted this boilerplate language merely as a "go by," and that he did not consider it to limit his actions in any way.[12] When asked if it was true that he "didn't give much thought to what this meant" and whether he "just thought it was something some boilerplate that ought to be" in the warrant, SA Marrero agreed "for the most part," stating only that he "knew it was used before so it was appropriate language." Marrero Tr. 39:11–19.

Throughout his testimony, SA Marrero was unequivocal in his belief that he did not consider himself to be limited to seizing business items only, or records that tended to show evidence of violations of the health care fraud statute. In fact, SA Marrero indicated that he *intended* to seize personal financial records and "didn't intend to limit the financial records to business records." Marrero Tr. 42:1–2. Responding to cross examination inquiring about whether he thought the limiting language of the warrant had any meaning, SA

**12.** Marrero testified "this introductory paragraph I used from—in many of our cases health care cases we use go byes and this introductory paragraph is a paragraph that I received or got from another attachment to— for another health care fraud search warrant. My intention when I wrote this affidavit was to get the items listed in the numbers but as far as the legalese and the wording, I just wanted to stay consistent with what the court generally got and received and reviewed for attachments and search warrants." Marrero Tr. 33:18–34:2.

Marrero stated "being here I didn't mean to limit the items to just items relating to the business. Otherwise I would not have included the items in paragraph five that's clearly not related to the business." [13] Marrero Tr. 34:18–21. At the suppression hearing, SA Marrero even went so far as to suggest that the warrant language limiting the search to business records that showed health care fraud was "just an expression," and that "after reading [the warrant] over and over again [he] [still] d[id]n't believe after reading it it limits it to items related to the business." *Id.* 35:7–10. It is clear that SA Marrero was unequivocal in his belief that the limiting

---

13. Paragraph five of the warrant authorized the seizure of Dr. Srivastava's passports and visas. SA Marrero's testimony indicated that this is "something that [he] do[es] in pretty much all of [his] investigations" because a passport may show that "he could not have performed [a] service at P.G. hospital because he wasn't there[,] he was overseas," for example. Marrero Tr. 7:15–23. On cross examination, defense counsel probed SA Marrero's logic:

Q: You thought that [Dr. Srivastava] wasn't billing for [heart catheterization procedures] in a correct manner?
A: I thought he was billing for a service that he wasn't providing.
Q: That had to do with the issue of whether he was invading or getting into both chambers of the heart as opposed to just one, right?
A: That's correct.
Q. But that allegation didn't have to do with him billing for wholly fictitious procedures where he was in India and there was no patient in the hospital.
A: No. That allegation had nothing to do with that.
Q: Right. Okay. And in fact, there was no allegation in the affidavit that had to do with him billing for people on days where he wasn't present.
A: No.
Q: All right. So, your indication that you wanted to get passports or visas because that might be the case was something that you just do as a matter of routine not because it was a specific concern in this case, right?
A: That's correct. I do that in most of my cases.

Marrero Tr. 23:7–24:4

This paragraph of the warrants also authorized the seizure of pictures, and SA Marrero's view on how virtually limitless he saw the warrants' provisions was further borne out in cross examination regarding the authorization to seize photographs.

Q: You told them what they should look for and what they could take.
A: Correct

\* \* \* \* \* \*

Q: Pictures [?]
A: That's what I said. I hope I got that right. I thought that pictures were in here. Yes. Yes, it is.
Q: Okay well pictures of what?
A: This goes back to the same thing. If there's a picture of the doctor on a cruise in the Bahamas on a certain day, that's evidence of—and then I have a bill for service in P.G. Hospital that would be evidence that he was or even a picture at another state that would be evidence that he wasn't there on that day.
A: Well, okay but attachment A doesn't say photographs of Dr. Srivastava anywhere else than being in Prince George's County it just says photographs, doesn't it?
Q: That's?
A: That's correct.
Q: Are you telling me that your oral instructions to the agents were you can seize photographs that show Dr. Srivastava in exotic locations if you can figure out where they are and if you can figure out what the date is?
A: I didn't get into that specificity but that was the purpose and intent of putting that in the attachments and the agents should be aware of that.

Marrero Tr. 29:20–31:4.

SA Marrero's attitude towards the seizure of passports, visas, and photographs of Dr. Srivastava further supports this Court's conclusion that he took an extremely broad, inappropriate view of the warrant. In fact, he admitted that with respect to these items that "it wouldn't matter to [him] whether [Dr. Srivastava's] activities were of a family nature or whether his activities were of a business nature." Marrero Tr. 46:3–8.

words of the warrant were meaningless to him and that he "did not intend to limit [the search or the warrant] to just business records." *Id.* 36:1–3.

For SA Marrero, the "go by" may have only existed for consistency's sake or as a mere formality, but for the judge who issued the warrants and for this Court, this language is certainly not meaningless. As discussed above, the subject matter limitation of evidence related to health care fraud and the limitation that financial papers seized be related somehow to the medical practice of Dr. Srivastava were limitations necessary to make the warrant comport with the particularity requirement of the Fourth Amendment. Nevertheless, SA Marrero approached, and counseled

other agents to approach, the search in a way that authorized the seizure of virtually any document of Dr. Srivastava. Simply stated, his view was "whatever financial records if it has [Dr. Srivastava's] name on it . . . the judge gave us the authority to seize financial records [and] we could take it." Marrero Tr. 44:2–4.[14]

SA Marrero's view that he had limitless power to seize virtually anything from Dr. Srivastava's home and business is, at best, troublesome.[15] SA Marrero's expansive view of the warrants and his related approach to the searches, which he imparted to all agents who participated, created a situation where executing agents grossly exceeded the scope of the search warrants.[16] This Court is mindful that it is a

**14.** SA Marrero admitted that he told the agents responsible for executing the three warrants that they could take any financial records, stating "I told them financial records and then I may have—I may have indicated you know tax records or the specific wording that's here, but that's it." Marrero Tr. 32:17–19. When asked whether he informed agents that they were only to take financial records related to Dr. Srivastava's business, which may constitute evidence of violations of 18 U.S.C. § 1347, SA Marrero indicated that he did not inform the agents of this limitation. *Id.* at 32:25–33:10.

**15.** The search inventory log, Marrero Exh. 1, reveals that agents seized items including wallets, papers regarding Dr. Srivastava's summer home, uncashed checks, unopened mail, and information regarding his new house. In fact, several large boxes of personal documents voluntarily returned by SA Marrero shortly after the execution of the search were displayed to the Court by Dr. Srivastava's counsel at the suppression hearing. The returned documents included an invitation to a cultural gala, Dr. Srivastava's "CV S Extra-Care" card, his AAA card, and checks from several bank accounts. *See* Marrero Tr. 15:2–5.

**16.** This conclusion is further supported in light of volume of documents eventually returned to Dr. Srivastava. Following the execution of the search warrant, an attorney

representing Dr. Srivastava contacted SA Marrero and the United States Attorneys' Office expressing his belief that agents exceeded the scope of the search warrant and seized items that were outside its scope. Beginning on March 24, 2003, SA Marrero began to return documents to Dr. Srivastava; on March 24, SA Marrero returned a wallet with three credit cards, some Indian currency, and a patient chart, and on March 26, SA Marrero returned licensing information, a CV S pharmacy card, a AAA card, and various checks. On April 3, 2003, SA Marrero returned computer hard drives to Dr. Srivastava, and on April 24, 2003, SA Marrero returned "many of the boxes and their contents." Marrero Tr. 13:7–14:6. The chain of custody log introduced as an Exhibit at the suppression hearing reveals that "Boxes 1, 2, 3, 18, 5, 16, 7, 4, 15, 6, 10, 17 and items from other boxes" were returned. *See* Marrero Exh. 2. The government's own opposition concedes that "approximately 80 percent of the documents seized from [Dr. Srivastava's] home were returned to him by the investigating agents." *See* Paper no. 14 at 24. It is this Court's conclusion that this large-scale return of information seized from Dr. Srivastava further bears out how SA Marrero's cavalier attitude towards the limitations of the warrant caused agents to grossly exceed its scope.

rare situation indeed where agents are found to be so excessive in their execution of a search warrant that blanket suppression is warranted, but in light of SA Marrero's alarming testimony, the undersigned finds inexorable the conclusion that this rare remedy is appropriate in this case. *Accord United States v. Robinson,* 275 F.3d 371, 382 (4th Cir.2001)(blanket suppression appropriate when "searching officers may be said to have flagrantly disregarded the terms of a warrant [by] engag[ing] in 'indiscriminate fishing' for evidence"). This is not a case where "some seized items were not identified in the warrant," or where "agents exceeded the limits of their authority under the warrant based on practicality considerations or mistake." *Uzenski,* 434 F.3d at 707 (citing *Robinson,* 275 F.3d at 382 (finding no flagrant disregard where most items seized that were outside scope of warrant were found within items of greater evidentiary value—e.g., a grocery list found within an address book authorized under the warrant)); *United States v. Chen,* 979 F.2d 714, 718 (9th Cir.1992)(finding no flagrant disregard where agents installed additional surveillance camera based on their mistaken belief that the warrant permitted an extra camera and practicality concerns that the first camera could not capture the entire area).

Authority cited by the government itself supports this proposition. In *United States v. Rettig,* 589 F.2d 418, 421 (9th Cir.1978), a search warrant authorized the seizure of marijuana and related paraphernalia, as well as documentary evidence containing "indicia of the identity of the residents" of the house to be searched. In executing the warrant, officers seized more than 2,000 documents, including "numerous United States government publications, blank applications for various credit cards, bank brochures, medical and dental records, drug store receipts for a period extending over two years prior to the search, photograph slides, undeveloped film, extensive financial records, credit cards and travel documents." *Id.* at 421. Observing that "[a]n examination of the books, papers and personal possessions in a suspect's residence is an especially sensitive matter," the court concluded that "the record establishes that the agents did not confine their search in good faith to the objects of the warrant, and that while purporting to execute it, they substantially exceeded any reasonable interpretations of its provisions." *Id.* at 422–23. So holding, the *Rettig* court concluded that *all* evidence seized during the search must be suppressed. *Id.* at 423. *See also Foster,* 100 F.3d. at 850; *Medlin,* 842 F.2d at 1198 (finding flagrant disregard and granting blanket suppression where officers seized 667 items not specified by the warrant).

Unlike many other cases, this Court believes that the facts here provide "probative indicia of flagrant disregard or bad faith," and therefore finds that the agents' seizure of the many items outside the warrant transformed what should have been a particularized search into a general, unrestricted fishing expedition. *Uzenski,* 434 F.3d at 708. The "rule of excluding all evidence seized in a general search is designed to combat the very mind set displayed by [SA Marrero]. The belief that a search warrant gives an officer free rein to search and seize cannot be tolerated." *United States v. Larson,* 1995 WL 716786, at *7 (D.Kan. Nov.16, 1995). Condoning SA Marrero's conduct would be "to invite a government official to use a seemingly precise and legal warrant only as a ticket to get into a man's home, and, once inside, to launch forth upon unconfined searches and indiscriminate seizures as if armed with all the unbridled and illegal power of a general warrant." *Stanley v. Georgia,* 394 U.S. 557, 572, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969)(Stewart, J. concurring). Such an unconfined search and in-

discriminate seizure is precisely what happened here. Because this Court concludes that SA Marrero approached the searches of Dr. Srivastava's home and offices in a way that flagrantly exceeded the specific limitations of the warrants, and that the agents grossly exceeded the scope of the warrants in their execution,[17] all evidence seized in the March 21, 2003, searches must be suppressed, unless saved by an applicable exception to the exclusionary rule.

### III. Can the illegally seized documents nevertheless be admitted under any exception to the exclusionary rule?

If the evidence taken from Dr. Srivastava's home was not in fact properly seized—either because it was not within the scope of the warrant, or because the searches as a whole were so grossly overbroad as to make all documents seized inadmissible-all fruits derived therefrom must be suppressed. *Wong Sun v. United States*, 371 U.S. 471, 485–86, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). However, in some cases evidence derived from an illegal search may avoid exclusion if it is sufficiently attenuated to dissipate the taint of the initial violation. *United States v. Ceccolini*, 435 U.S. 268, 274–75, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978)(declining to adopt a "per se" or "but for" rule making inadmissible any evidence that came to light through a chain of causation beginning with a constitutional violation). As the Supreme Court recently observed in *Hudson v. Michigan*,

> The exclusionary rule generates "substantial social costs," *United States v. Leon*, 468 U.S. 897, 907, 104 S.Ct. 3405,

82 L.Ed.2d 677 (1984), which sometimes include setting the guilty free and the dangerous at large. We have therefore been "cautio[us] against expanding" it, *Colorado v. Connelly*, 479 U.S. 157, 166, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), and "have repeatedly emphasized that the rule's 'costly toll' upon truth-seeking and law enforcement objectives presents a high obstacle for those urging [its] application," *Pennsylvania Bd. of Probation and Parole v. Scott*, 524 U.S. 357, 364–365, 118 S.Ct. 2014, 141 L.Ed.2d 344 (1998) (citation omitted). We have rejected "[i]ndiscriminate application" of the rule, *Leon, supra*, at 908, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677, and have held it to be applicable only "where its remedial objectives are thought most efficaciously served," *United States v. Calandra*, 414 U.S. 338, 348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974)-that is, "where its deterrence benefits outweigh its 'substantial social costs,' " *Scott, supra*, at 363, 524 U.S. 357, 118 S.Ct. 2014, 141 L.Ed.2d 344 (quoting *Leon*, supra, at 907, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677).

—— U.S. ——, 126 S.Ct. 2159, 2163, 165 L.Ed.2d 56 (2006). In this case, the government contends that even if the Court finds that agents exceeded the scope of the warrant, such evidence could still be admissible under either the "independent source" or "inevitable discovery" doctrines. Each of these two doctrines will be discussed in turn.

### A. Inevitable discovery

 Under the inevitable discovery doctrine, information obtained by unlawful

---

17. SA Marrero's approach taints the execution of all three search warrants. Each warrant contained the same qualifying language and detailed the same items to be seized, and each warrant was supported by a single affidavit detailing allegations of health care fraud. SA Marrero made clear throughout

his testimony that he imparted his overly broad view of the warrant to the entire search team, and agreed that he shared his perceptions with the team at the preparatory meeting. *See* Marrero Tr. 47:5–48:5; Marrero Tr. 53:1–21; Marrero Tr. 74:16–22; *see also* Footnote 14, *supra*.

means is nonetheless admissible "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams,* 467 U.S. 431, 444, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). "[T]he exception requires the district court to determine, viewing affairs as they existed at the instant before the unlawful search, what would have happened had the unlawful search never happened." *United States v. Eng,* 997 F.2d 987, 990 (2d Cir.1993) (citations and quotations omitted). Such a finding of "inevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment." *Nix,* 467 U.S. at 444–45, 104 S.Ct. 2501.

Although the government initially asserted that the inevitable discovery exception might save the evidence at issue in this case, it conceded at oral argument that such an exception is not applicable here. This concession was wise. Although some may envision a behemoth IRS computer that meticulously checks every person's 1099s against income reported on their returns (1040s), this is simply not the case, as the government now concedes.[18] SA Louden of the IRS testified at the evidentiary hearing that to expect the IRS to automatically notice even extremely large discrepancies would be "giving the IRS too much credit as far as what their capabilities are. No offense on the civil

side but, I mean, it's—the program is not perfect. The database is not perfect." Louden Tr. 41:18–21.[19] SA Louden later acknowledged that at the time that she began looking into Dr. Srivastava's affairs, there was a lot of discussion in the IRS about the fact that the audit rate was so low, a fact attributable in part to the fact that "[t]he IRS was short staffed." Louden Tr. 45:7–15.

In light of this, the government cannot point to any historical and demonstrable facts that justify admitting the documents gathered in the IRS investigation pursuant to the inevitable discovery exception. The government does not, and indeed cannot, make the argument that there was any (much less a sufficiently developed) tax evasion investigation in existence prior to the search of Dr. Srivastava's home and office, and that this investigation would have inevitably gleaned the evidence that the government now seeks to offer against him. This is not, therefore, a situation where "the fact making discovery inevitable ... arise[s] from circumstances other than those disclosed by the illegal search itself." *United States v. Thomas,* 955 F.2d 207, 211 (4th Cir.1992).

Furthermore, it cannot be credibly claimed that the improper seizure of Dr. Srivastava's personal and financial documents "played no real part" in the subsequent IRS investigation and discovery of evidence supporting criminal tax evasion charges. *See United States v. Whitehorn,*

---

**18.** Moreover, capital gains from options trading is not reported to the IRS.

**19.** On cross examination, defense counsel probed the reality of the IRS' ability to verify the submission of all taxpayers:

Q: ... There is something call[ed][the] IDRS matching program. Do you know about that?

A: No. I don't think I know it called matching program if you explain it to me I might say, oh yes.

Q: Let me try. I've had it happen to me. If you get a 1099 from a bank for interest for $100 and it doesn't appear on your tax return, the computer will notice that and spit out a notice to you and say, you know, why isn't this on your tax return? That's the IDRS matching program. [A]re you aware of that?

A: I've never known it to work that efficiently.

Q: Exactly.
Louden Tr. 38:18–39:5.

813 F.2d 646, 649 n. 4 (4th Cir.1987), *cert. denied* 487 U.S. 1234, 108 S.Ct. 2898, 101 L.Ed.2d 931 ("the premise of the inevitable discovery doctrine is that the illegal search played no real part in discovery of incriminating evidence. Only then, if it can be shown that the taint did not extend to the [subsequent investigation] would the product of the [subsequent investigation] be admissible.") This key limitation, which prevents the government from profiting from its own wrongdoing, is noticeably absent here. The government does not point to any facts supporting the contention that absent the documents seized from Dr. Srivastava's home and business, the IRS would have inevitably investigated him and uncovered all of the evidence at issue. The mere fact that the IRS *might* have audited Dr. Srivastava at some point in the future is insufficient, as the inevitable discovery doctrine requires proof that the evidence *would* have, not merely could have, been discovered.[20] *Morris*, 684 F.Supp. at 416; *see also United States v. Ford*, 184 F.3d 566, 578 (6th Cir.1999)(rejecting inevitable discovery exception when testimony showed that IRS was not actively investigating defendant's tax records or was otherwise "hot on the trail of the disputed evidence"); *Thomas*, 955 F.2d at 211 (finding inevitable discovery doctrine did not permit admission of evidence seized after surveillance had been set up following illegal entry into defendant's hotel room; "the bank money found in the illegal search changed the whole nature of the investigation that followed.").

**B. Independent Source**

The independent source doctrine provides another exception to the exclusionary rule. The Supreme Court has held that merely because evidence is unlawfully acquired, "this does not mean that the facts thus attained become sacred and inaccessible. If knowledge of them is gained from an independent source, they may be proved like any others...." *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920). The independent source doctrine rests "upon the policy that, while the government should not profit from its illegal activity, neither should it be placed in a worse position than it would otherwise have occupied." *Murray v. United States*, 487 U.S. 533, 542, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988). As the Supreme Court observed in *Nix*,

> [T]he interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse*, position than they would have been in if no police error or misconduct had occurred.... When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation.

467 U.S. at 443, 104 S.Ct. 2501. This doctrine saves from exclusion evidence that has been discovered by means "wholly independent of any constitutional violation." *Id.* Put another way, where agents engage in investigative activity that is later determined to be illegal, evidence is still admissible if discovered through a source independent of the illegality. *See Murray*, 487 U.S. at 537, 108 S.Ct. 2529.

To evaluate whether the independent source exception applies, the Court must determine "whether, granting establishment of the primary illegality, the

---

**20.** Indeed, SA Louden's testimony indicated that the statute of limitations had already run for several of the tax years at issue.

evidence to which the instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." [21] *Wong Sun,* 371 U.S. at 488, 83 S.Ct. 407. Relevant factors include (1) the time between any illegal action and the later acquisition of evidence, (2) intervening circumstances and (3) the purpose and flagrancy of the official misconduct. *Brown v. Illinois,* 422 U.S. 590, 603–04, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *United States v. Seidman,* 156 F.3d 542, 548 (4th Cir.1998). Courts must "careful[ly] sift[ ] [through] the unique facts and circumstances" of each case to make a finding with respect to whether the alleged "independent" source is sufficiently attenuated. *Schneckloth v. Bustamonte,* 412 U.S. 218, 233, 93 S.Ct. 2041, 36 L.Ed.2d 854, (1973). The ultimate burden of proving admission of tainted evidence rests on the government. *Seidman,* 156 F.3d at 548 (citing *Schneckloth,* 412 U.S. at 238, 93 S.Ct. 2041).

### 1. The development of the allegedly "independent" IRS investigation

■ As discussed above, agents executing the search of Dr. Srivastava's Greenbelt office came upon faxes confirming the transfer of funds to an account at the Bank of India. Elton Malone, the search warrant team leader at the Greenbelt site, called SA Marrero on his cell phone while Marrero was conducting the search at Dr. Srivastava's Oxon Hill office and informed him that one of the agents located faxes showing transactions overseas involving foreign bank accounts.

Marrero Tr. 9:17–22. Agent Malone indicated that the transactions appeared to involve a substantial amount of money, and asked SA Marrero if he was aware of this. SA Marrero informed him that he was not, but would inform the Assistant United States Attorney handling Dr. Srivastava's case; he did so the same day.

On April 23, 2003, the United States Attorneys' Office related this information to SSA Bradley Whites, the IRS agent in charge of the agency's Wheaton, Maryland office. Specifically, the United States Attorneys' Office informed SSA Whites that there was some evidence of significant money going overseas and that it did not appear that the appropriate box on Dr. Srivastava's Schedule B had been checked. Louden Tr. 2:21–3:1. SSA Whites met with SA Louden, related this information, provided her with SA Marrero's name and phone number, and asked her to follow up with Marrero. Louden Tr. 4:21–22. This same day, SA Louden spoke with SA Marrero regarding the faxes showing the transfer of money to the State Bank of India, and later that same day SA Marrero faxed SA Louden these papers. After receiving this information, SA Louden requested information on Dr. Srivastava using the IRS' Integrated Data Retrieval System ("IDRS"), a database that allows the agency to view online tax return information. Louden Tr. 6:13–17. SA Louden also testified that she looked into the treasury enforcement communication system to verify if Dr. Srivastava had disclosed any foreign bank accounts, and observed that he had not. Louden Tr. 8:1–8.

---

**21.** "The exclusionary rule does not require the exclusion of evidence 'when the causal connection between [the] illegal police conduct and the procurement of [the] evidence is "so attenuated as to dissipate the taint" of the illegal action.'" *United States v. Liss,* 103 F.3d 617, 620 (7th Cir.1997); *see also United States v. Najjar,* 300 F.3d 466, 477 (4th Cir. 2002)("not all evidence conceivably derived from an illegal search need be suppressed if it is somehow attenuated enough from the violation to dissipate the taint."). In other words, under the "independent source" doctrine, suppression of physical evidence under the Fourth Amendment does not convey derivative use immunity.

SA Louden received Dr. Srivastava's IDRS information on April 25, and certain information on the IDRS summary sheet caught her eye. SA Louden testified that the summary sheet on the IDRS printout normally displays how many dollars in interest income the taxpayer earned, but in this case, the section of the report that displayed income from 1099B activity (stock and bond activity), displayed only stars ("* * * * *") and no numerical data. After consulting with someone more familiar with the IDRS system, SA Louden learned that the stars represented an extremely large number that was too big to print on the summary form. Louden Tr. 9:15–24. To receive further information, on April 25, 2003, SA Louden requested a second round of IDRS so that she could examine the detailed information from Dr. Srivastava's 1099 B forms (which show capital gains). SA Louden testified that she received the 1099 B information relating to the capital gains on June 12, 2003. Louden Tr. 11:25. On July 10, 2003, SA Louden began to do a comparison with the Dr. Srivastava's 1099Bs and his reported tax returns.

On May 19, 2003, the United States Attorneys' Office formally invited the IRS to join the existing grand jury investigation into Dr. Srivastava. Once the tax and health care fraud investigations were joined, SA Louden requested (through the United States Attorneys' Office) that the grand jury issue several subpoenas to banks with whom Dr. Srivastava did business; these were issued on June 2, 2003. She testified that in determining what subpoenas to request, "generally the schedule B is a good place" because it gives accounts; SA Louden also indicated that "in this particular case [she] believe[d] that Jason [Marrero] had faxed [her] over some bank accounts that he had identified from the search warrant evidence."[22] Louden Tr. 14:10–19.

Three days after these subpoenas were issued, SA Louden traveled on June 5, 2003, with IRS SA Grytzer to meet SA Marrero at the Rockville office of HHS. SA Louden testified that during that meeting, the agents examined evidence that Marrero and his team had recovered from the search of Dr. Srivastava's home and businesses. Specifically, she indicated that she and the other agents "went into a

**22.** This testimony is consistent with her explanation of where the specific account information came from for the individual subpoenas of the financial institutions. SA Louden testified "I can't exactly remember. Some of this information came from Jason [Marrero] I believe who had located some information and I believe what I—when he sent me that fax, I verified it to my Schedule B and said, oh, yes I see there is Bentley Lawrence or National—you know City Corp. And then also the actual 1099 Bs later the—the 1099 Bs actually show the account number on them as well and I can't remember if the 1099 dividends show the account number but they definitely show the bank. . . ." Louden Tr. 16:6–15.

It bears special emphasis, and will be discussed later, that SA Louden *twice* admitted that some of the information she received regarding what subpoenas to issue was given to her by SA Marrero. While SA Louden

indicated that she also relied on Dr. Srivastava's Schedules B of his tax returns to uncover the names of financial institutions she wished to subpoena, this Court notes that some of the financial institutions subpoenaed on June 2, 2003, do not appear to be listed in Dr. Srivastava's Schedules B. *Compare* Hearing Exhs. Louden 1 and Louden 3 (Dr. Srivastava's 1998 and 1999 Federal Income Tax Returns) *with* Hearing Exhs. Louden 5–Louden 16 (subpoenas for various financial institutions). This strongly suggests to this Court that SA Marrero did in fact provide additional information that would not have been otherwise known to SA Louden, specifically, the names of financial institutions with which Dr. Srivastava did business, and that this information helped to guide SA Louden's investigation. If this is true, it only further supports this Court's conclusion that the independent source exception does not apply in this case.

room, and then these boxes were pulled, and [they] basically just looked through the boxes to see kind of what he had and make heads or tails of it." [23] Louden Tr. 25:1–4. During her review of the documents in SA Marrero's possession, SA Louden examined a fax relating to Dr. Srivastava's Bentley Lawrence accounts. SA Louden testified that this 12 page fax related to the 1998 tax year and showed account transactions and short term capital gains and losses. Louden Tr. 26:12–16. SA Louden further testified that she also reviewed certain spreadsheets in SA Marrero's possession concerning Dr. Srivastava, which contained a record of Dr. Srivastava's financial transactions and "showed few capitol [sic] losses but overall capitol [sic] gains." Louden Tr. 27:10–15. Upon finding these documents, SA Louden testified that her "original thoughts were, I have to validate they're accurate so I had to go through each transaction and make sure it was a legitimate transaction . . . . using the statements." Louden Tr. 27: 25–28:6. Comparing these documents and spreadsheets against Dr. Srivastava's tax returns, SA Louden found what appeared to be over $40 million in unreported capital gain income. Louden Tr. 28:10–11. As her investigation continued, SA Louden met with Dr. Srivastava's CPA and stockbroker to further her tax investigation. SA Louden then spent several months doing capital gains calculations to recalculate the true gains and losses realized by Dr. Srivastava. Louden Tr. 32:24–33:5. Her efforts culminated in the present indictment alleging income tax evasion and the filing of a false income tax return.

### 2. Application of the independent source doctrine

Considering the factual development of the IRS investigation, the government contends that this Court need not exclude the financial records seized from Dr. Srivastava's home and business. In addressing the factors set forth in *Brown*, the government asserts that while the IRS investigation was close in time to the execution of the search warrant, it was completely separate and proper. The government explains that:

> days, weeks and months passed between the execution of the warrants and the acquisition of all of the IRS's documentary evidence. There were numerous intervening circumstances, particularly SA Louden's lawful use of IRS investigative resources and grand jury subpoenas. Finally, defendant does not even allege that SA Louden's investigation—the investigation that led to the indictment—involved any official misconduct, let alone intentional or flagrant misconduct. Accordingly, copies of seized documents that were obtained from independent sources during the subsequent IRS investigation should not be suppressed.

As such, the government asserts that notwithstanding any constitutional violations committed in the execution of the warrant, the fruits of the IRS investigation should not be excluded. *See United States v. Watson*, 950 F.2d 505, 508 (8th Cir. 1991)("where a law enforcement officer merely recommends investigation of a particular individual based on suspicions arising serendipitously from an illegal search, the causal connection is sufficiently attenuated so as to purse the later investigation of any taint from the original illegality.").

Dr. Srivastava, on the other hand, suggests that in order to be truly independent of evidence seized during an illegal search, there must be *no* causal connection be-

---

**23.** SA Marrero had previously returned many documents taken during the searches. *See* Footnote 16, *supra.*

tween the second source of the contested material and the illegal search. *See Segura v. United States,* 468 U.S. 796, 815, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984)(holding that the independent source exception applied because information possessed by the agents *before* they illegally entered and searched an apartment constituted an independent source for the discovery and seizure of the evidence later challenged). In this case, Dr. Srivastava asserts that the IRS had no knowledge, much less independent knowledge, of Dr. Srivastava's personal financial situation before the HHS agents executed their searches and provided certain items to the IRS. Therefore, he maintains that the tax investigation was not truly "independent."

As is often the case, the truth lies somewhere between these two interpretations. Although the independent source rule can save from suppression evidence that would not have been uncovered "but for" an illegal search (evidence that therefore has *some* causal connection), the doctrine is not as broad as the government asserts. As this Court, Judge Murray presiding, observed in *United States v. Morris,*

> [w]here courts have applied the independent source doctrine to admit evidence arguably tainted by unlawful police conduct, there has been a showing that the evidence *was in fact obtained through an independent source and not through exploitation of the unconstitutional behavior.*

684 F.Supp. 412, 416 (D.Md.1988)(emphasis added). This comports with the Supreme Court's view of the independent source doctrine. *See e.g., Murray,* 487 U.S. at 542, 108 S.Ct. 2529 (holding that evidence seized pursuant to a subsequently issued warrant, although initially discovered during an illegal search, is admissible so long as "the search pursuant to the warrant was in fact a genuinely indepen-

dent source of the information and tangible evidence at issue").

An examination of cases where evidence has been admitted under the independent source doctrine illustrates the critical point that, to be admissible under this exception, the so-called independent source must retain a critical degree of separation from the tainted source. In *Segura,* for example, the Supreme Court held that this exception applied because no information obtained during the initial (illegal) entry into the defendant's apartment was needed or used by the agents to secure the warrant under which the disputed evidence was ultimately seized. 468 U.S. at 815, 104 S.Ct. 3380 (1984). The Court concluded that "[t]he illegal entry into the [defendants] home did not contribute in any way to discovery of the evidence . . ." because it was "beyond dispute that the information possessed by the agents *before* they entered the apartment constituted an independent source for the discovery and seizure of evidence now challenged." *Id.* at 815–16, 104 S.Ct. 3380. (emphasis added). *See also United States v. Williams,* 400 F.3d 1023, 1025 (7th Cir.2005)(independent source doctrine applied because there was no causal link between the warrantless search of defendant's residence and decision to seek a warrant); *United States v. Walton,* 56 F.3d 551, 554 (4th Cir.1995)(reasoning that a lengthy prior investigation of the defendant demonstrated the necessary attenuation and independent basis of probable cause to apply the independent source doctrine); *United States v. Curtis,* 931 F.2d 1011, 1014 (4th Cir.1991), *cert. denied,* 502 U.S. 881, 112 S.Ct. 230, 116 L.Ed.2d 186 (1991)(denying motion to suppress because the information used to secure a search warrant was independent of any evidence found during the warrantless search); *United States v. Palumbo,* 742 F.2d 656, 661 (1st Cir.1984)(valid search warrant based en-

tirely on probable cause learned prior to original, putatively unlawful, entry into defendant's premises), *cert. denied,* 469 U.S. 1114, 105 S.Ct. 799, 83 L.Ed.2d 792 (1985).

These cases suggest that courts apply the independent source doctrine when *untainted evidence* does, in fact, provide an *independent* basis for the discovery of evidence. It is therefore essential that there must have been *an independent basis for the discovery of challenged evidence,* not merely that the information merely *had* an independent existence. *Accord United States v. Brainard,* 690 F.2d 1117, 1126 (4th Cir.1982)(list of defendant's clients and employees improperly obtained by SEC investigator admissible because information in list was independently obtained by materials subpoenaed by the grand jury *prior to* receipt of tainted documents from other investigation); *United States v. David,* 943 F.Supp. 1403, 1417 (finding agents' decision to further investigate defendant was not prompted by discovery of a firearm in the allegedly unlawful search). This view of the independent source rule protects its integrity and prevents this exception from swallowing the exclusionary rule.[24]

In order to be admissible under the independent source doctrine, the connection between the original illegality and the evidence at issue must be sufficiently attenuated so as to dissipate the taint of the illegal search. *See Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939). Here, the primary taint has not been purged because the evidence procured by SA Louden clearly "has been come at by exploitation of (the primary) illegality." *Wong Sun,* 371 U.S. at 488, 83 S.Ct. 407. Indeed, the primary

illegality was not attenuated, but rather was repeatedly exploited. Only after she received the Bank of India faxes and analyzed those money transfers did SA Louden request the IDRS information on Dr. Srivastava and begin to delve into his tax returns. In fact, SA Marrero specifically informed SA Louden that the boxes on Dr. Srivastava's Schedules B (copies of which SA Marrero seized from his residence) were not checked to reflect his ownership of any foreign bank accounts. This sharing of information is particularly salient in tax cases:

> The unique circumstances of an income tax investigation make a decision to focus intensively of critical importance. As opposed to crimes like assault or robbery, tax evasion is hidden. There are at least hundreds of thousands of tax violators whose criminality has not been revealed. One of the chief problems for the government is to decide how it is going to utilize its limited tax investigation forces. The main hope of a tax violator is that the Internal Revenue Service will remain unaware of his existence. Once the government begins to concentrate all its enormous resources on a citizen, the chance of its discovering that he has violated the tax laws is greatly multiplied. It is difficult to perceive how the government could receive any more valuable information than the name of a probable tax violator.

*United States v. Schipani,* 289 F.Supp. 43, 62–63 (E.D.N.Y.1968)(overruled on other grounds). SA Louden exploited the information provided to by SA Marrero by using it to seek IRDS information, and later recover copies of Dr. Srivastava's tax returns and other financial papers. This

---

**24.** Treatises recognize that "the independent source limitation operates even where there is a de facto causal connection between the proffered evidence and the initial illegality to render the proffered evidence admissible where it is also the product of a *concurrent investigative process in no way dependent upon information learned through lawless official acts."* 43 A.L.R.3d 485. (emphasis added)

evidence therefore cannot be considered independent.

The government cites to the Eighth Circuit case of *United States v. Watson* for the proposition that "where a law enforcement officer merely recommends an investigation of a particular individual based on suspicions arising serendipitously from an illegal search, the causal connection is sufficiently attenuated so as to purge the later investigation of any taint from the original illegality." 950 F.2d 505, 508 (8th Cir.1991). Another district court later recognized, however, that the *Watson* Court did not explicitly apply the *Wong Sun* standard. *See Larson*, 1995 WL 716786 at *8. *Larson* is factually similar to this case; there, officers reviewed illegally seized documents which revealed that defendant had transacted with numerous financial institutions using various aliases, and discovered the names of several financial instructions dealing with the defendant. Acting on this information, law enforcement visited the financial institutions and subpoenaed their records listing defendant and his aliases; the government later sought to admit this evidence against defendant at trial. Considering this factual development, the *Larson* court concluded that the evidence was not sufficiently attenuated because "the information in the illegally seized documents was exploited to obtain the financial records for which the government seeks admission." *Id.* at *9. The government attempted to argue that the financial records were obtained by sufficiently distinguishable means because they were secured through grand jury subpoenas. The court disagreed, noting that at least some of the documents produced to the grand jury were copies of the very documents that were illegally seized. The court concluded that "the government's

choice to use the documents produced in response to the grand jury subpoena does not render perforce those documents 'obtained by means sufficiently distinguishable from the prior illegality.' " [25] *Id.*

Such is the case here. Although the evidence illegally seized from Dr. Srivastava's home and offices subsequently has been obtained through SA Louden's investigation and grand jury subpoenas, this is not sufficiently attenuated to justify its admission. As in *Larson*, SA Louden exploited the information in the illegally seized documents to obtain the financial records that the government now seeks to admit. It is only because of the exploitation of the information displayed in the Bank of India faxes and taxpayer copies of Dr. Srivastava's tax forms (which were examined by seizing agents) that SA Louden initiated her IDRS request. Furthermore, SA Louden twice admitted at the suppression hearing that she received specific bank names from SA Marrero indicating which financial institutions she should subpoena for further information. *See* Louden Tr. 14:10–19 (stating that to determine what subpoenas to request the U.S. Attorneys office issue, "in this particular case I believe that Jason [Marrero] had faxed me over some bank accounts that he had identified from the search warrant evidence."); Louden Tr. 16:6–15 ("Some of this information [used to determine what financial institutions to subpoena] came from Jason [Marrero]"). Finally, SA Louden also testified that once her investigation began she actually met with SA Marrero and reviewed the seized documents in HHS custody. In perusing these boxes, SA Louden uncovered a fax regarding capital gains from 1998 and several spreadsheets showing capital gain income

---

**25.** The *Larson* court ultimately concluded that there was an independent source for the documents, however, because the bank manager conducted his own investigation into defendant and his accounts.

*which she then utilized to compare against Dr. Srivastava's filed tax returns and uncover discrepancies.*

In this case, there is not just an initial taint; instead, the taint here is *continuous.* In light of this initial and continual taint, the Court is nonplussed by the government's suggestion that because the IRS investigation secured copies of the documents initially seized, the documents need not be suppressed. The financial and tax documents that the government seeks to introduce at trial, even if they are later-acquired *copies* of the documents illegally seized during the March 20th search, are off limits because they were not obtained by means sufficiently distinguishable from the prior illegality.[26]

Although the government cited *United States v. Najjar* only parenthetically in its opposition to Dr. Srivastava's motion, it sought to rely primarily on this case at the suppression hearing to support the proposition that the independent source doctrine saves the documents at issue here from exclusion. 300 F.3d 466 (4th Cir.2002). In *Najjar*, a defendant sought suppression of evidence obtained through two warrants, arguing that much of the evidence used to secure these warrants derived from the execution of an invalid search. Officers investigating a chopshop had conducted a search that was later found to be illegal; those officers shared automobile salvage certificates found during the first illegal search with another law enforcement officer, who began an internal investigation

26. It is also problematic for the government's position that where courts have applied the independent source doctrine to admit evidence arguably tainted by unlawful police conduct, they "have emphasized the necessity of showing that the evidence *would* have been uncovered independently; not merely that it *could* have been." *Morris,* 684 F.Supp. at 416 (evidence supporting conviction would not have been independently or inevitably discovered and should have been suppressed)(emphasis added); *see also Wardrick,* 350 F.3d. at 451 (applying independent source doctrine where officer "had an *earlier,* independent source for th[e] information"). Here, Defendant asserts that there is no evidence that the IRS had, could have, or would have initiated a criminal tax investigation of Dr. Srivastava absent information and documents passed on by SA Marrero, and that therefore this exception should not apply. As was the case in *Morris,* nothing supports a finding that the IRS *would have* commenced the investigation before it received the financial information that was illegally-obtained. 684 F.Supp. at 415 (no evidence that officers intended to or actually would have searched vehicle where contraband was found before they discovered a pistol in defendant's purse in an unconstitutional search).

In *United States v. Guarino,* 610 F.Supp. 371 (D.R.I.1984), the government, pursuant to a warrant issued for materials that violated the obscenity laws, seized "all printed material from the [defendant's] offices including records of various companies run by the Defendant ... pension files, [and] personal papers...." *Id.* at 375. Records of the defendant's various businesses were turned over to the IRS, which, unlike the instant case, had been investigating the defendant prior to the illegal search. Notwithstanding the previously initiated IRS investigation, the *Guarino* court rejected the government's "general assertion that the 'natural progression' of the IRS investigation would have uncovered those business documents" seized in the illegal search because "[t]he record fails to indicate ... that the Government had sufficient knowledge, prior to the search, regarding the various companies apparently controlled by the defendant, to be able to subpoena those particular documents." *Id.* at 379–80. Like *Guarino,* here the subsequently obtained documents were summonsed only after the illegal search; the government's own chronology demonstrates that SA Louden's 'standard investigative techniques' were dormant until awakened by impermissibly seized evidence. In fact, this case is even more clear cut than *Guarino,* as in that case the IRS *already had begun* an investigation into the defendant. As previously discussed, here, no such investigation existed, making the independent source exception even more illusory.

into another officer. These salvage certificates were ultimately dead ends because the investigating officer found no log records or incident reports to trace the certificates to activities of the person under investigation. The investigator then had to regroup and approached his investigation from another angle, broadening his inquiry into other illicit activities similar to those suggested by the illegally seized certificates. In light of these facts, the *Najjar* court rejected defendant's contention that suppression was necessary merely because "the illegally obtained evidence tended significantly to direct the evidence in question." *Id.* at 479.

Several critical distinctions emerge between the facts of *Najjar* and the facts of this case. First, in *Najjar*, the government did not seek to introduce the illegally seized salvage certificates, but rather sought the admission of *other* evidence that came to light through later independent investigation. In comparison, here the government seeks to introduce *the very evidence that was illegally seized in the first instance.* Second, in this case there was no impediment that caused the IRS to reach a dead end and begin a new investigative chain. In *Najjar*, the court explicitly found that the "investigation was not a simple matter of looking at salvage certificates and obtaining new evidence from their use, rather it was a substantial investigative effort unconnected to the seized documents themselves once [the investigating officer] encountered the impediment at the Maryland State Police barracks." *Id.* at 479. Here, SA Louden's investigation *was* "a simple matter of looking at [the Bank of India faxes] and obtaining new evidence from their use." *Id.* There was no impediment leading to a totally new investigative focus; rather, each piece of evidence was acquired in direct response to analysis of the previous information. All of this is directly traceable, with no attenuation, to the evidence illegally seized.

SA Louden's testimony revealed a third, fatal, factor that by itself completely removes this case from *Najjar* and the independent source doctrine. She testified that she based her subpoena requests both on Schedule B information she recovered from the IDRS system *and* on names that SA Marrero provided to her as institutions that would be of interest to her tax investigation. Additionally, nearly two months after her tax investigation commenced, she traveled to an HHS office and met with SA Marrero to review the documents that this Court now holds were illegally seized from Dr. Srivastava. SA Louden perused the documents in SA Marrero's possession, and used spreadsheets and a fax found there to help further flesh out the alleged tax fraud committed by Dr. Srivastava. Using these statements, she discovered an apparent underreporting of $40 million in capital gain income. Louden Tr. 28:6–11. SA Louden's investigation therefore not only started as the fruit of the poisonous tree, but also she returned to the proverbial tree for additional tainted fruit.

Thus, attenuation is not present here because unlike in *Najjar*, there was further significant contact and interaction between the supposedly "independent" investigation and the tainted source. It is one thing to say that a later investigation is sufficiently independent and attenuated when the illegally seized evidence does not directly generate any information for the "independent" source, and there is no continued contact between the "independent" source and the tainted evidence. It is quite another thing to suggest that so long as another government agency secures the same evidence as the tainted evidence, such evidence need not be excluded, even if the "independent" source continued to interact with the tainted evidence. Appli-

cation of the independent source doctrine and *Najjar* is unavailing where the illegally seized evidence is used directly and repeatedly to generate the evidence at issue, and the supposedly independent agent returns to the poisonous tree for yet more helpings of the forbidden fruit. *Accord United States v. Pope,* at *4 ("Because the traffic stop was fruit and thus contaminated with illegitimacy, the evidence subsequently secured as a result was thus also unlawfully acquired.").

The Court therefore concludes that the IRS investigation is too closely connected to the initial illegal seizure, and is not "so attenuated as to dissipate the taint" of the illegal seizure. *Nardone,* 308 U.S. at 341, 60 S.Ct. 266. Application of the *Brown* factors supports this conclusion. Here, as a result of the sharing of financial information seized from Defendant, SA Louden of the IRS was conducting a full blown criminal tax investigation within *six weeks* (factor one: time between investigations). SA Louden's investigative techniques detailed by the government cannot possibly be considered to be "intervening circumstances" because they were done in direct response to the information received from SA Marrero. Indeed, SA Louden admitted that she based her subpoena requests in part on SA Marrero's suggestions, and even met with him during her investigation to discuss the evidence and review other documents that were impermissibly seized. Investigating agents here therefore did substantially more than in the cases relied upon by the government, in that SA Marrero recommended an investigation, provided the IRS with documents to start such an investigation, provided the IRS with specific account names, and met with the IRS during the course of its investigation (factor two: intervening circumstances). *Accord Larson,* 1995 WL 716786 at *8 (rejecting application of *Watson* when information in illegally seized documents was pursued and exploited to obtain financial records that government sought to use against defendant). Although there are no allegations of official misconduct on the part of SA Louden, this absence does not make an otherwise closely-related investigation sufficiently attenuated for the purposes of this exception to the exclusionary rule (factor three: official misconduct).

Because all of the investigative steps taken by the IRS were taken, directly or indirectly, as a result of the illegal search, and because the taint of the illegal seizure was reinforced by the continued interaction between SA Marrero and SA Louden, this Court concludes that all documents generated by the IRS investigation are tainted, not independent, and must be excluded.

## CONCLUSION

The exclusionary rule has exacted a mighty toll in this case. Although this Court is troubled by its determination that the motion to suppress should be granted, this conclusion was driven by precedent and compelled by the facts of this case. Although it is no doubt unsettling that Dr. Srivastava may escape criminal accountability because of the blunders of law enforcement, this is the rare and unfortunate case where such a price must be paid. As Justice Clark acknowledged, "In some cases, this will undoubtedly be the result. But ... 'there is another consideration—the imperative of judicial integrity.' The criminal goes free, if he must, but it is the law that sets him free. Nothing can destroy a government more quickly than its failure to observe its own laws, or worse its disregard of the charter of its own existence." *Mapp v. Ohio,* 367 U.S. 643, 659, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (citation omitted). With great disappointment, and for the reasons discussed above, the Court will, by separate order, grant Dr. Srivastava's Motion to Suppress.

## ORDER

Upon consideration of the Plaintiff's Motion for An Evidentiary Hearing Pursuant to *Franks v. Delaware* and to Suppress Evidence [Paper no. 13], the opposition thereto, the arguments presented by counsel at hearings before the undersigned on March 27, 2006, and June 19, 2006, for the reasons stated on the record on March 27, 2006, and for the reasons stated in the accompanying opinion, it is this 4th day of August, 2006, by the United States District Court for the District of Maryland,

**ORDERED,** that Plaintiff's Motion for an Evidentiary Hearing Pursuant to *Franks v. Delaware* and to Suppress Evidence [Paper no. 13] is **GRANTED IN PART** and **DENIED IN PART;** and it is further

**ORDERED,** that Plaintiff's Motion for an Evidentiary Hearing Pursuant to *Franks v. Delaware* and to Suppress Evidence [Paper no. 13] is **DENIED** to the extent it seeks an evidentiary hearing pursuant to *Franks v. Delaware;* and it is further

**ORDERED,** that Plaintiff's Motion for an Evidentiary Hearing Pursuant to *Franks v. Delaware* and to Suppress Evidence [Paper no. 13] is **GRANTED** to the extent that it seeks the suppression of evidence; and it is further

**ORDERED,** that all evidence seized by government agents on March 21, 2003, pursuant to three search warrants signed by Magistrate Judge Connelly on March 20, 2003, including but not limited to

1. Spreadsheet detailing options transactions on Bentley–Lawrence ("BL") Account;

2. Spreadsheet detailing stock transactions on BL Account, labeled "Corporate;"

3. Spreadsheet detailing options transactions on Speer Leeds account;

4. Spreadsheet detailing stock transactions;

5. Schedule of realized gains and losses;

6. Form 1099 activity detail for BL account;

7. Form 1099 activity detail for BL account;

8. Form 1099 activity detail for BL account;

9. Fax from CPA requesting information to prepare tax return;

10. Tax reporting statement to support capital gains;

11. Form 1099 activity detail supporting capital gains;

12. Handwritten bank interest and payments statement;

13. Tax reporting statement to support capital gains;

14. Form 1099 activity detail to support capital gains;

15. Fax to CPA detailing BL accounts;

16. Form 1099 activity detail supporting capital gains;

17. Tax reporting statement to support capital gains;

18. Form 1099 activity detail to support capital gains;

19. Tax reporting statement to support capital gains;

20. Fax from CPA requesting items to complete tax return;

21. Handwritten list of dividends and interest from bank accounts;

22. Tax reporting statement to support capital gains;

23. Tax reporting statement to support capital gains;

24. Spreadsheet for capital gains;

25. Email from stock broker detailing stock activity;

is hereby **SUPPRESSED.**