# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellant,*

v.                                                    No. 07-4386

PRADEEP SRIVASTAVA,
        *Defendant-Appellee.*

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Roger W. Titus, District Judge.
(8:05-cr-00482-RWT)

Argued: March 19, 2008

Decided: September 3, 2008

Before NIEMEYER and KING, Circuit Judges, and
David R. HANSEN, Senior Circuit Judge of the
United States Court of Appeals for the Eighth Circuit,
sitting by designation.

Vacated and remanded by published opinion. Judge King
wrote the opinion, in which Judge Niemeyer and Senior Judge
Hansen joined.

## COUNSEL

**ARGUED:** Stuart A. Berman, OFFICE OF THE UNITED
STATES ATTORNEY, Greenbelt, Maryland, for Appellant.

Paula Marie Junghans, ZUCKERMAN & SPAEDER, L.L.P., Washington, D.C., for Appellee. **ON BRIEF:** Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, for Appellant. P. Andrew Torrez, ZUCKERMAN & SPAEDER, L.L.P., Washington, D.C., for Appellee.

---

**OPINION**

KING, Circuit Judge:

The government seeks relief, by way of this interlocutory appeal, from the Memorandum Opinion and Order entered in the District of Maryland on August 4, 2006, suppressing evidence seized by federal officers from the residence and medical offices of Dr. Pradeep Srivastava pursuant to search warrants issued by a magistrate judge. *See United States v. Srivastava*, 444 F. Supp. 2d 385 (D. Md. 2006) (the "Suppression Ruling"). The government also appeals from the court's order of March 6, 2007, declining to reconsider its Suppression Ruling. *See United States v. Srivastava*, 476 F. Supp. 2d 509 (D. Md. 2007). Put succinctly, the government contends that the evidence suppressed was constitutionally seized and within the scope of the search warrants, and that the court's blanket suppression of all seized evidence was erroneous. As explained below, we agree with the government that the Suppression Ruling was legally unsound, and thus vacate and remand.

I.

A.

In early 2003, a criminal investigation was initiated by the Department of Health and Human Services (the "HHS"), the Federal Bureau of Investigation (the "FBI"), and the government's Office of Personnel Management, into an alleged

health care fraud scheme involving Srivastava, a licensed cardiologist practicing with two associates in Maryland. The federal authorities suspected that Srivastava and his associates were involved in the submission of false claims to various health care benefit programs, in violation of 18 U.S.C. § 1347.[1] As a result, the authorities commenced an investigation into Srivastava's billing practices.

In March 2003, the fraud investigation had progressed to the stage where Jason Marrero, an HHS agent specializing in the investigation of health care fraud ("Agent Marrero"), applied to a magistrate judge in the District of Maryland for three search warrants. By Agent Marrero's submission to the judge, the government sought the seizure of the "fruits, evidence and instrumentalities of false claims submissions" from Srivastava's medical offices in Greenbelt and Oxon Hill (the "Greenbelt office" and the "Oxon Hill office," respectively), and from his residence in Potomac (the "Potomac residence"). J.A. 31.[2] The applications for the search warrants were supported by Agent Marrero's nineteen-page affidavit (the "Affidavit"), in which he specified, inter alia, that Srivastava and his medical practice group had defrauded health care benefit programs in various ways: billing for medical services not

---

[1]Section 1347 of Title 18 makes it an offense to

knowingly and willfully execute[ ], or attempt[ ] to execute, a scheme or artifice—

(1) to defraud any health care benefit program; *or*

(2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program,

in connection with the delivery of or payment for health care benefits, items, or services.

18 U.S.C. § 1347 (emphasis added).

[2]Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties in this appeal.

rendered; billing for duplicate medical services through different insurers; specifying inappropriate diagnosis codes for patient services on medical claims; improperly billing for incidental services; and altering medical records. The Affidavit also described specific instances of false billing for services not rendered, as well as for duplicate services, including dollar amounts paid for excess reimbursements.

Significantly, the Affidavit made factual assertions indicating that documents and records related to Srivastava's medical practice — constituting possible evidence of health care fraud — would be found in the Potomac residence:

- A former employee of Srivastava, who was a confidential informant in the fraud investigation, confirmed that Srivastava "directed most of the billing to health care benefit programs," and that such programs "sent most payments and Explanation of Benefit letters to Srivastava's house," J.A. 42;

- Srivastava had the medical practice's "insurance billing done from [his] house," and the practice submitted such billing to insurers both "by mail and electronically by computer," *id.*; and

- Srivastava had "listed and currently lists [the Potomac] residence . . . as the billing address for claims submitted electronically to Medicare," *id.* at 46.

On the basis of these and other facts spelled out in the Affidavit, Agent Marrero asserted "that there is probable cause to believe that Srivastava's [Greenbelt and Oxon Hill] offices . . . and Srivastava's [Potomac] residence . . . contain fruits, evidence and instrumentalities of [health care fraud] and that the items [sought] are fruits, evidence and instrumentalities of the violation." *Id.* at 48.

On March 20, 2003, the magistrate judge issued three search warrants, each accompanied by an identical two-page "Attachment A," captioned "Items To Be Seized Pursuant To A Search Warrant." J.A. 49-51.[3] The warrants "commanded" the searching officers, inter alia, to search the Greenbelt office, the Oxon Hill office, and the Potomac residence on or before March 27, 2003, and, if the property listed in Attachment A "be found there to seize same." *Id.* at 49. Attachment A introduced the list of documents and records to be seized under each warrant as follows:

> The following records including, but not limited to, financial, business, patient, insurance and other records related to the business of Dr. Pradeep Srivastava [and his two associates], for the period January 1, 1998 to Present, which may constitute evidence of violations of Title 18, United States Code, Section 1347.

*Id.* at 50. Attachment A then specified in some detail ten categories of things that were to be seized, including personnel records; health care benefit program manuals and documentation; correspondence between medical office personnel and health care benefits program personnel; documents relating to investigations of the medical group's billing practices; records of complaints about patient treatment; records of certain specified patients; computer files or programs related to the other materials identified; plus calendars, appointment books, correspondence, passports, photographs, and other documents indicating Srivastava's whereabouts during the period under investigation. *Id.* at 50-51. Importantly, category 2 of Attachment A commanded the seizure of "[f]inancial records, including but not limited to accounting records, tax records,

---

[3]Only one of the three search warrants — for the Oxon Hill office — is contained in the Joint Appendix filed by the parties. It is undisputed, however, that the three warrants, except for describing the place to be searched, are materially identical.

accounts receivable logs and ledgers, banking records, and other records reflecting income and expenditures of the business." *Id.* at 50.[4]

---

[4]The other nine categories of documents and records commanded to be seized were, as described in Attachment A of the search warrants, the following:

    1.    Personnel records for all current and former employees, including but not limited to lists of employee names, employee resumes, employee time sheets, job applications, job training records, profession[al] certifications, and payroll records.

* * *

    3.    Health care benefit program training manuals, regulations, bulletins, reports, notices, pamphlets, and correspondence concerning proper billing and documentation procedures, and any documentation regarding instructions for billing health care benefit programs.

    4.    Correspondence, memoranda, and notes of conversations, including but not limited to those relating to communications between medical office personnel and personnel for health care benefit programs.

    5.    Any and all records indicating [Dr.] Pradeep Srivastava's [or his associates'] locations and activities during the period January 1, 1998 to the present, including but not limited to calend[a]rs, appointment books, correspondence, passports, visas, photographs and other documents.

    6.    Any documents [ ]including but not limited to reports, correspondence, memorandums, work papers, interview notes and other notes relating to any internal or external investigation, audit, or other review of the billing/medical practice of Dr. Pradeep Srivastava, to include [his associates].

    7.    Records of complaints, including but not limited to complaints concerning the treatment provided by [Dr.] Pradeep Srivastava [or his associates].

    8.    All information and/or data, pertaining to records described in this Attachment above, stored in the form of magnetic or electrical coding on computer media or on media capable of being read by a computer or with the aid of computer related equipment. This media includes but is not limited to floppy diskettes, fixed hard disks, video cassettes, and any other media which is capable of storing magnetic coding.

B.

On March 21, 2003, HHS and FBI agents simultaneously executed the search warrants at the three specified locations. Prior to the searches being conducted, Agent Marrero briefed the executing officers on what was to be done, summarizing for them the contents of the warrants and the Affidavit. Two of the searches — those conducted at the Greenbelt office and the Potomac residence — yielded the seizure of documents and records that are specifically implicated in this appeal.[5]

From the Potomac residence, the officers seized, inter alia, copies of the tax returns of Dr. Srivastava and his wife; stock brokerage account records; information about the construction of a second home; bank records relating to several family financial transactions; travel information; Srivastava's wallet; unopened mail; credit cards; Indian currency; a pharmacy card; and checks from various banks. From the Greenbelt office, the agents seized, inter alia, copies of bank remittance

---

9. Computer codes and programs, computer software, instructional manuals, operating instructions and sources of information, to the extent that they are necessary to extract and copy any of the information set forth in paragraphs 1 through 8 above.

10. All patient records and documentation relating to the Medicare beneficiaries and private health care insurance subscribers listed below. This includes complete medical files, patient appointment books, patient billing records, office sign-in sheets, explanation of benefits (EOBs), and telephone messages in any form. [Several pages of Medicare beneficiaries and insurance subscribers were thereafter identified.

J.A. 50-51.

[5]Although a substantial group of documents and records were also seized in the third search (of the Oxon Hill office), and are also encompassed in the Suppression Ruling, the government does not presently propose to utilize them at trial.

records relating to the State Bank of India (collectively, the "Bank of India Transfers"). The Bank of India Transfers reflected, inter alia, that Srivastava had, over a period of several months in 1999 and 2000, transferred more than $4 million to the State Bank of India.

In April 2003, after the searches had been completed, the government returned to Srivastava approximately 80% of the documents and records seized from the Potomac residence.[6] During the same time frame, Agent Marrero provided the United States Attorney with a copy of the Bank of India Transfers, which were also provided to the Internal Revenue Service (the "IRS"). IRS agents thereafter concluded that the Bank of India Transfers indicated a likely failure to disclose a foreign financial account.[7] After obtaining other information relating to the Transfers — for example, that Srivastava had not acknowledged any foreign bank accounts on his 1999, 2000, and 2001 personal income tax returns — the IRS initiated an investigation of Srivastava for possible reporting violations. This investigation ultimately led to his indictment for tax fraud.

---

[6]The return to Srivastava in April 2003 of approximately 80% of the things seized from the Potomac residence resulted from an agreement between the parties. In returning those records, the government did not concede that they had been improperly seized. By their agreement in this regard, the lawyers apparently obviated the need for preindictment proceedings under Rule 41(g) of the Federal Rules of Criminal Procedure. *See infra* note 20. As a result, the suppression issues were not litigated until early 2006.

[7]As mandated by Treasury Department regulations, a report must be filed with the IRS by any person in and doing business in the United States, who possesses an interest in or authority over a foreign financial account exceeding $10,000 during a calendar year. *See* 31 C.F.R. §§ 103.24, 103.27(c); *see also* 31 U.S.C. § 5315(c) (authorizing Secretary of Treasury to prescribe reporting requirements); *id.* § 5322 (providing criminal penalties for willful violations of Treasury Department regulations, such as those mandating foreign financial account reports).

## C.

On October 12, 2005, Srivastava was indicted by a grand jury in the District of Maryland on two counts of tax evasion, in violation of 26 U.S.C. § 7201, plus one count of making false statements on a tax return, in violation of 26 U.S.C. § 7206(1).[8] According to the indictment, Srivastava had concealed more than $40 million in capital gains on investments in technology stocks and stock options, and underpaid his income taxes for tax years 1998 and 1999 by more than $16 million. The indictment alleges, inter alia, that:

- Srivastava invested a substantial portion of income from his medical practice in stocks and stock options, but failed to provide important information relating to his stock and stock options trading to the accountant who prepared his tax returns;

- As a consequence of those omissions, the accountant prepared, and Srivastava filed, tax returns that resulted in an underpayment of taxes in 1998 by approximately $165,000, and in 1999 by more than $16 million;

- In 2000, Srivastava's portfolio substantially declined in value, and he failed to disclose short-term capital losses of approximately $ 10.8 million. Although nondisclosure of these losses did not affect his taxes due and owing for 2000, it served to conceal his unreported short-term capital gains for 1998 and 1999.

In January 2006, following his indictment, Srivastava filed a suppression motion challenging the constitutionality of the seizures that had been made nearly three years earlier, pursu-

---

[8]The indictment is found at J.A. 7-26.

ant to the search warrants. In that motion, Srivastava contended, inter alia, that documents and records seized in the searches were of a personal nature and not subject to seizure, and that the seized documents and records exceeded the scope of the warrants.[9] Responding to the suppression motion, the government advised the court that it possessed approximately twenty-five documents and records — all seized from the Potomac residence — that it intended to use as trial evidence (collectively, the "Potomac Documents"). Several of the Potomac Documents had been seized from Srivastava's bedroom in the Potomac residence, including:

- An IRS Form 1099 for tax year 1999 found in an envelope marked as "1999 Final";[10]

- Several documents from an envelope dated October 15, 1996, including multiple IRS Forms 1099 for tax year 1998, a handwritten document describing "Bank Interest Payment," and a statement and fax relating to accounts with "Mesirow Financial Inc./Bentley-Lawrence Securities";[11] and

---

[9]In his effort to suppress the evidence seized under the warrants, Srivastava also sought an evidentiary hearing in the district court, pursuant to *Franks v. Delaware*, maintaining that the Affidavit had affirmatively omitted material information. *See* 438 U.S. 154, 155-56 (1978) ("[W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request."). At a March 27, 2006 hearing conducted on the suppression motion, the district court denied Srivastava's request for a *Franks* hearing, after determining that the magistrate judge had not been misled by the Affidavit.

[10]An IRS Form 1099 is used to report various types of income — other than wages, salaries, and tips — to the IRS. Such income includes, inter alia, dividends and distributions, interest, government payments, payments to independent contractors, and miscellaneous income.

[11]Although several Potomac Documents discovered in the Potomac residence were found in folders dated 1996, the Documents seized sufficiently related to the pertinent time frame.

- Several documents from a folder labeled "1996 Tax Info.," including IRS Forms 1099 for tax years 1997 and 1999, spreadsheets for accounts variously labeled "Options Transactions" and "Stock Transactions," a "Schedule of Realized Gains and Losses" dated October 14, 1999, and a 1999 "Tax Reporting Statement."[12]

Several other Potomac Documents that the prosecution seeks to utilize at trial were found in a shoe box marked "Tax Return Info 2000," seized from an office on the first floor of the Potomac residence. The documents from the shoe box included:

- A fax (dated October 8, 2001) from Srivastava's accountant requesting items needed to complete Srivastava's 2000 tax return;

- A spreadsheet labeled "Accounts of Dr. Pradeep Srivastava/Stock Transactions — 8/25/99 to 12/31/99 By Bentley Lawrence Account"; and

- A handwritten document with information about various bank accounts and transactions.

In opposing the suppression motion, the government alternatively advised that, if the court suppressed the Potomac Documents, it intended to utilize at trial the Bank of India Transfers seized from the Greenbelt office, "to explain the independent source for [the IRS case agent's] investigation and the inevitable discovery of the brokerage, bank and other evidence supporting the tax charges." J.A. 110. The Bank of India Transfers included the following:

---

[12]Intermingled with the financial records discovered in one of the folders located in the bedroom of the Potomac residence were other records of Srivastava's medical practice, including a client master list, employee time sheets, and a memorandum relating to employee leave and vacation time. The government does not propose to offer those items into evidence.

- A letter from Srivastava, dated December 16, 1999, printed on the medical practice letterhead of "Pradeep Srivastava, M.D., F.A.C.C." and an associate, and faxed by the Greenbelt office manager to the State Bank of India in New York, directing a wire transfer of the sum of $150,000 for deposit in Srivastava's account with the State Bank of India in New Delhi;

- A fax cover and confirmation sheet dated December 16, 1999, also on the medical practice letterhead; and

- Remittance confirmations of various dates from the State Bank of India regarding the $150,000 deposit and seven other deposits totalling more than $4 million.

On June 9, 2006, the court conducted an evidentiary hearing on Srivastava's contentions regarding the scope of the search warrants and the constitutionality of their execution. At the hearing, the court heard testimony from Agent Marrero and an IRS agent, as well as argument concerning whether the seized documents and records were within the scope of the warrants. Srivastava contended, inter alia, that although such documents and records may have financial significance, they did not relate to his medical practice, were not evidence of health care fraud, and thus were not within the ambit of the warrants. The government maintained to the contrary, arguing that the seized documents and records plainly fell within the scope of the warrants and that the suppression motion should be denied.

## D.

On August 4, 2006, the district court issued its Suppression Ruling, ordering the suppression of the Potomac Documents, the Bank of India Transfers, and all other evidence seized in

the three searches. In so ruling, the court first determined that "in order to fall within the scope of the warrant, a financial record not only had to have some relationship to Dr. Srivastava's business, but it also was subject to the requirement that it may constitute evidence that health care fraud had been committed." *United States v. Srivastava*, 444 F. Supp. 2d 385, 393 (D. Md. 2006). Next, the court analyzed whether, in view of the foregoing, the seizures of the Potomac Documents and the Bank of India Transfers were within the scope of the search warrants issued for the Potomac residence and the Greenbelt office, respectively. The court then concluded that the Potomac Documents had been improperly seized, because they "neither tended to show violations of the health care fraud statute, nor related to the business of Dr. Srivastava." *Id.* at 395. Turning to the Bank of India Transfers seized from the Greenbelt office, the court determined that, although they "arguably may have related to the business of Dr. Srivastava," nothing on their face "connotes or suggests evidence of health care fraud." *Id.* The Affidavit, the court emphasized, failed to discuss the handling of any financial proceeds of a fraud scheme, which, it observed, is a federal crime (i.e., money laundering) distinct from the federal offense of health care fraud. *Id.* at 396. The court thus concluded that, as with its suppression of the Potomac Documents, suppression of the Bank of India Transfers was constitutionally required.

Finally, the court considered the question of whether a blanket suppression of all of the seized evidence was warranted, concluding that

> [e]ven if . . . some of the documents at issue here were within the scope of the warrant, these documents would be excluded as well because the conduct of the agents who executed this warrant was so inappropriate as to warrant the exclusion of *all* evidence seized on March 21, 2003.

*Srivastava*, 444 F. Supp. 2d at 396-97. The court premised its blanket suppression ruling on two primary bases: first, its conclusion that execution of the warrants contravened the Fourth Amendment, specifically with respect to the quantity and character of the documents and records seized (including those voluntarily returned to Srivastava by the government); and, second, the testimony of Agent Marrero at the June 9, 2006 hearing, indicating (in the court's words) that he "did not consider himself to be limited to seizing business items only, or records that tended to show evidence of violations of the health care fraud statute." *Id.* at 397.[13] The court thus suppressed all of the documents and records seized in the three searches. In so ruling, the court reasoned that such a blanket suppression was warranted because of Marrero's flagrantly excessive view of the scope of the warrants, and because such a view was not justified by either practical considerations or good-faith mistake. *See id.* at 400.[14] The Suppression Ruling thus barred the government from utilizing at trial (1) the Potomac Documents, (2) the Bank of India Transfers, and (3) all other documents and records seized under the warrants.

The government thereafter sought reconsideration of the Suppression Ruling, which the district court denied on March

---

[13]In the Suppression Ruling, the court observed that Agent Marrero had

> provided astonishing testimony in which he indicated that he inserted [the substantive introductory language] merely as a "go by," and that he did not consider it to limit his actions in any way. When asked if it was true that he "didn't give much thought to what this meant" and whether he "just thought it was some boilerplate that ought to be" in the warrant, [Agent] Marrero agreed "for the most part," stating only that he "knew it was used before so it was appropriate language."

*Srivastava*, 444 F. Supp. 2d at 397.

[14]The Suppression Ruling also concluded that the documents and records that the government proposed to utilize at trial were not otherwise admissible under either the inevitable discovery or independent source exceptions to a Fourth Amendment violation. *See Srivastava*, 444 F. Supp. 2d at 401-12.

12, 2007. *See United States v. Srivastava*, 476 F. Supp. 2d
509 (D. Md. 2007). In denying reconsideration, the court reit-
erated the Suppression Ruling's interpretation of the scope of
the warrants, its bases for suppressing the Potomac Docu-
ments and the Bank of India Transfers, and the reasons for its
blanket suppression of all the seized evidence. *See id.* at 512-
14.

The government disagrees with the Suppression Ruling and
the denial of its motion to reconsider, maintaining that those
decisions were erroneous and undermine its effort to prose-
cute the tax fraud indictment pending against Srivastava. As
a result, the government pursues this interlocutory appeal, and
Srivastava's trial has been held in abeyance pending the
appeal's resolution. We possess jurisdiction pursuant to the
provisions of 18 U.S.C. § 3731.[15]

II.

A.

Legal determinations made by a district court with respect
to a suppression issue, including interpretations of the scope
of a search warrant, are reviewed de novo on appeal. *See
United States v. Hurwitz*, 459 F.3d 463, 470 (4th Cir. 2006);
*United States v. Hurd*, 499 F.3d 963, 965 (9th Cir. 2007)
("Whether a search is within the scope of a warrant is a ques-
tion of law subject to de novo review."). In conducting such
a de novo review, we are obliged to assess the contents of a
search warrant and its supporting affidavits "in a common-
sense and realistic fashion," eschewing "[t]echnical require-
ments of elaborate specificity." *United States v. Ventresca*,

---

[15]In accordance with the jurisdictional predicate of 18 U.S.C. § 3731,
the United States Attorney has certified that this interlocutory appeal "is
not taken for purposes of delay" and that the evidence excluded by the
Suppression Ruling "is a substantial proof of a fact material in the pro-
ceeding." J.A. 725.

380 U.S. 102, 108 (1965); *see also United States v. Angelos*, 433 F.3d 738, 745 (10th Cir. 2006); *United States v. Gorman*, 104 F.3d 272, 275 (9th Cir. 1996).

We review for abuse of discretion a district court's blanket suppression of seized evidence. *See United States v. Borromeo*, 954 F.2d 245, 246 (4th Cir. 1992). We recognize that a district court necessarily abuses its discretion when it makes an error of law. *See Koon v. United States*, 518 U.S. 81, 100 (1996); *United States v. Ebersole*, 411 F.3d 517, 526 (4th Cir. 2005) ("By definition, a court abuses its discretion when it makes an error of law." (internal quotation marks omitted)). In analyzing the constitutionality of a search warrant's execution, we must conduct an "objective assessment of the [executing] officer's actions in light of the facts and circumstances confronting him at the time," rather than make a subjective evaluation of "the officer's actual state of mind at the time the challenged action was taken." *Maryland v. Macon*, 472 U.S. 463, 470-71 (1985).

B.

This appeal obligates us to assess, in a pretrial context, the Suppression Ruling made by the district court in connection with the tax fraud prosecution pending against Srivastava. The appeal implicates questions related to the *warranted* searches of Srivastava's Potomac residence and Greenbelt office. Such questions arise under the Fourth Amendment, which protects individuals against unreasonable searches and seizures conducted by the authorities, specifying its guarantee in the following terms:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly

describing the place to be searched, and the persons
or things to be seized.

U.S. Const. amend. IV.

The review of Fourth Amendment search and seizure issues
in our Court is not an uncommon occurrence. In most of these
instances, however, the issues arise from circumstances where
the authorities have conducted *warrantless* searches and sei-
zures of private property. As such, we are regularly called
upon to assess an array of constitutional issues that arise from
*warrantless* searches and seizures, in a wide range of circum-
stances. *See, e.g.*, *Coolidge v. New Hampshire*, 403 U.S. 443
(1971) (explaining "plain view" warrantless seizures); *Chimel
v. California*, 395 U.S. 752 (1969) (authorizing warrantless
searches incident to arrest); *Terry v. Ohio*, 392 U.S. 1 (1968)
(approving warrantless searches and seizures incident to "stop
and frisk" situations); *Warden v. Hayden*, 387 U.S. 294
(1967) (explaining "hot pursuit" principle of warrantless
searches and seizures).

Our Court — as well as the Supreme Court and other judi-
cial bodies — has consistently encouraged the authorities to
act prudently in the Fourth Amendment context, and, when
the circumstances permit, to seek and secure the authorization
of a judicial officer — in the form of a warrant — before con-
ducting a search or seizure. *See Ventresca*, 380 U.S. at 106 (in
explaining judiciary's strong preference for warranted
searches and seizures, observing that, "in a doubtful or mar-
ginal case a search under a warrant may be sustainable where
without one it would fall"); *see also United States v. Ser-
vance*, 394 F.3d 222, 229 (4th Cir. 2005) ("[L]aw enforce-
ment officers are encouraged to act pursuant to judicial
sanction, and searches and seizures carried out pursuant to
duly issued search warrants 'carry a presumption of legality.'"
(quoting *Anglin v. Dir., Patuxent Inst.*, 439 F.2d 1342, 1346
(4th Cir. 1971))). In this case, the government contends that
its agents acted both prudently and reasonably. The officers

first prepared an extensive and detailed Affidavit demonstrating probable cause for the searches and seizures they sought to carry out and then sought and secured the magistrate judge's authorization for the seizures.

By its Suppression Ruling, the district court determined that the search warrants authorized the seizure of only those "documents that related to Dr. Srivastava's business *and* that may show in some way that health care fraud had been committed." *United States v. Srivastava*, 444 F. Supp. 2d 385, 392 (D. Md. 2006). This conclusion provides the foundation for the issues presented in this appeal. First, the government asserts that the court erred in concluding that the Potomac Documents were not related to Srivastava's medical practice, were not likely to constitute evidence of health care fraud, and thus were not within the scope of the warrants. Second, the government maintains that the court erred in concluding that the Bank of India Transfers, although "legitimately appear-[ing] to be records of the business," were not evidence of health care fraud, and thus also not within the ambit of the warrants. *Id.* at 396. Finally, the government maintains that, in these circumstances, the warrants were properly executed and the blanket suppression ruling is legally defective.

### III.

In disposing of this appeal, we first assess whether the scope of the search warrants includes the two groups of documents that the government intends to use at trial: (1) the Potomac Documents and (2) the Bank of India Transfers. We then analyze whether the court's blanket suppression of all the seized evidence was legally justified.

### A.

We begin our analysis with the government's contention that the district court misconstrued the scope of the search warrant for the Potomac residence. In this regard, the court

determined that the Affidavit demonstrated probable cause that documents and records relating to Srivastava's medical practice, and that may constitute evidence of health care fraud, would be found in the residence. *See United States v. Srivastava*, 444 F. Supp. 2d 385, 392-93 (D. Md. 2006). Nevertheless, the court concluded that the warrant did not authorize the seizure of the Potomac Documents found there, because they were neither business-related nor evidence of health care fraud. *Id.* at 395-96.

1.

As the Suppression Ruling recognized, the Affidavit made compelling assertions that documents and records relating to Srivastava's medical practice — and that may constitute evidence of health care fraud — would be found in the Potomac residence. Indeed, Srivastava conducted a substantial part of his medical practice from the Potomac residence: claims for medical services were submitted to health care benefit programs from the residence; the residence was used as the billing address for the medical practice; and the practice received payments from such programs, both electronically and by mail, at the residence. In these circumstances, the magistrate judge was unquestionably justified in issuing the search warrant for the Potomac residence, commanding the officers to seize a broad range of things, "*including, but not limited to*, financial, business, patient, insurance and other records related to the business of Dr. Pradeep Srivastava . . . which may constitute evidence of [health care fraud]." J.A. 50 (emphasis added). The Affidavit established that documents and records sought from the residence — specifically (as identified in category 2 of Attachment A) Srivastava's "*[f]inancial records*, including but not limited to *accounting records*, *tax records*, accounts receivable logs and ledgers, *banking records*, and other records reflecting income and expenditures of the business" — related to his medical practice and constituted evidence of health care fraud. *Id.* (emphasis added). Finally, the categories of items designated for

seizure extended to (as identified in Category 5) Srivastava's "calend[a]rs, appointment books, correspondence, passports, visas, photographs and other documents." *Id.* at 51.

2.

We turn next to the issue of whether the Potomac Documents were within the scope of the search warrant for the Potomac residence. As the Supreme Court has mandated, and our sister courts of appeals have recognized, a search warrant is not to be assessed in a hypertechnical manner. *See United States v. Ventresca*, 380 U.S. 102, 108 (1965) (explaining that "[t]echnical requirements of elaborate specificity once exacted under common law pleadings" are not applicable in Fourth Amendment context); *see also United States v. Angelos*, 433 F.3d 738, 745 (10th Cir. 2006) ("We review de novo the scope of the search warrant at issue, employing a standard of practical accuracy rather than technical precision." (internal quotation marks omitted)); *United States v. Gorman*, 104 F.3d 272, 275 (9th Cir. 1996) ("[T]here is no room in the midst of a criminal investigation for hypertechnical reading or interpretation of a search warrant." (internal quotation marks omitted)). Instead, as the Supreme Court explained in *Ventresca*, we must simply assess such issues "in a commonsense and realistic fashion." 380 U.S. at 108; *see also Gorman*, 104 F.3d at 275 ("Plain reading and common sense are the landmarks for the execution and interpretation of the language of a search warrant." (internal quotation marks omitted)).[16]

---

[16]Although our Court has, on many occasions, applied *Ventresca*'s "commonsense and realistic fashion" principle in analyzing the sufficiency of supporting affidavits, we do not appear to have specifically utilized this principle in assessing the scope of a search warrant. On this point, however, we readily agree with the Ninth and Tenth Circuits, *see Gorman*, 104 F.3d at 275; *Angelos*, 433 F.3d at 745, and apply the *Ventresca* principle to our assessment of the seizures being challenged, eschewing a hypertechnical approach to these issues.

As the district court concluded in its Suppression Ruling, "in order to fall within the scope of the warrant, [the Potomac Documents] not only had to have some relationship to Dr. Srivastava's business," but were also "subject to the requirement that [they] may constitute evidence that health care fraud had been committed." *See Srivastava*, 444 F. Supp. 2d at 393. Accordingly, we analyze whether the Potomac Documents were related to Dr. Srivastava's medical practice and whether they may constitute evidence of health care fraud, beginning with their relationship to his business.

a.

Although Srivastava argues on appeal that the search warrant for the Potomac residence limited the authorized seizures to those documents and records that are "related to the business" (i.e., the medical practice), this contention does not undermine the constitutionality of the seizure of the Potomac Documents. Of note, Srivastava's medical practice operated as a "Subchapter S" corporation, under which his portion of the practice's income was passed through and taxed directly to him as an individual.[17] In such circumstances, it is difficult to realistically define a bright line between "personal financial records" and "business records," as Srivastava implores us to do. Rather, it is consistent with both common sense and realism to deem the financial records relating to the medical practice as being nearly synonymous with the financial records of Srivastava individually. By way of example, with respect to the Potomac Documents seized from Srivastava's bedroom:

- The IRS Form 1099 for tax year 1999 found in an envelope marked "1099 Final" constituted a financial record, as specified in category 2 of

---

[17]A corporation that elects to be taxed under Subchapter S, *see* 26 U.S.C. §§ 1361-63, pays no federal income tax, but passes all its income and losses through to its shareholders. Those shareholders then report the income or losses on their individual tax returns.

Attachment A. Under law, an IRS Form 1099 reflects income paid to a taxpayer. In this instance, the Form reflected certain interest income paid to Srivastava in 1999, which also, in these circumstances, reasonably related to his business of practicing medicine; and

• Additional IRS Forms 1099 for tax year 1998 (found in the envelope dated October 15, 1996) and for tax years 1997 and 1999 (from the folder marked "1996 Tax Info.") likewise constituted financial records related to Srivastava and his medical practice, specified for seizure under Attachment A.

Assessed in a de novo context, the balance of the Potomac Documents also were within the ambit of the financial records specified for seizure in category 2 of Attachment A. More specifically, those records — reflecting stock and option transactions and banking activities — related to the receipt of Srivastava's income and, thus, also reasonably related to his medical practice. Accordingly, we cannot agree with the district court that such documents were outside the scope of the warrant for being non-business related.

b.

We next consider the Suppression Ruling's conclusion that the Potomac Documents were not within the scope of the search warrant for the Potomac residence because they failed to satisfy the magistrate judge's requirement that things could only be seized if they "may constitute evidence that health care fraud had been committed." *Srivastava*, 444 F. Supp. 2d at 393. In this regard, we emphasize that the warrant's mandate was only that seized items "relate[ ] to the business" of Dr. Srivastava and "*may* constitute evidence of [health care fraud]." J.A. 50 (emphasis added). Thus, we must conduct our de novo assessment with this mandate in mind. Pursuant to

the warrant, documents or records to be seized were not required, on their face, to necessarily constitute evidence of health care fraud — rather, they only potentially had to be evidence of such fraud. And, in the context of a fraud investigation, the relevant evidence will in many instances be fragmentary, discovered in bits and pieces, and thus difficult to either identify or secure. Standing alone, a particular document may appear innocuous or entirely innocent, and yet be an important piece of the jigsaw puzzle that investigators must assemble. The complexity of a fraud scheme, however, should not be permitted to confer some advantage on the suspected wrongdoer. *See Andresen v. Maryland*, 427 U.S. 463, 481 n.10 (1976) ("The complexity of an illegal scheme may not be used as a shield to avoid detection when the State has demonstrated probable cause to believe that a crime has been committed and probable cause to believe that evidence of this crime is in the suspect's possession.").

Here, the Affidavit demonstrated probable cause that Srivastava's medical practice had submitted fraudulent claims to health care benefit programs from the Potomac residence, suggesting that the executing officers were likely to encounter a "paper puzzle" in carrying out the command of the warrant. For example, a piece of the fraud puzzle in this case included Srivastava's financial records, such as IRS Forms 1099 reflecting his income. *Cf. United States v. Norton*, 867 F.2d 1354, 1360 (11th Cir. 1989) (recognizing that financial records were pieces of "paper puzzle" verifying fraudulent kickback scheme). Indeed, a time-honored concept in white-collar and fraud investigations is simply to "follow the money." *See, e.g.*, David M. Nissman, *Follow the Money: A Guide to Financial and Money Laundering Investigations* (2005). That principle is particularly applicable here, and it is deserving of emphasis. The possession or transfer of "large sums of money, and the manner in which those funds were acquired [are] highly relevant to proof of [a] scheme to

defraud." *United States v. Shamy*, 656 F.2d 951, 958 (4th Cir. 1981).[18]

Having made a de novo assessment of the scope of the warrant for the Potomac residence — and having done so in a non-hypertechnical, common-sense, and realistic manner — we are satisfied that the Potomac Documents were within the scope of its specifications. The Affidavit spelled out a complex fraud scheme, and the warrant specified that things related to Srivastava's medical practice, and that may constitute evidence of health care fraud, would be discovered in the residence. In these circumstances, we are simply unable to rule that the Potomac Documents could not constitute evidence of health care fraud. As a result, the seizure of the Potomac Documents was consistent with the scope of the warrant and the mandate of the Fourth Amendment.

B.

Turning to the government's contention that the Bank of India Transfers were within the scope of the search warrant issued for the Greenbelt office, we conclude that they were also erroneously suppressed by the district court. In this regard, the Suppression Ruling recognized that the Bank of India Transfers "legitimately appeared to be records of the business." *Srivastava*, 444 F. Supp. 2d at 396. Nevertheless, the court concluded that the warrant for the Greenbelt office did not authorize the seizure of the Transfers because they did not constitute evidence of health care fraud. In so ruling, the court determined that the Affidavit failed to show probable cause for seizure of the Transfers as financial proceeds evidence, emphasizing that there had been no discussion in the

---

[18]The reasoning underlying this point — that evidence of the possession and transfer of large sums of money can, in the proper context, be a strong indicia of fraud — is further emphasized by our analysis of the district court's erroneous suppression of the Bank of India Transfers. *See infra* Part III.B.

Affidavit of "what Dr. Srivastava may have done with the monies he received as payment for his procedures," or "how [he] handled his banking." *Id.* Furthermore, the court observed that concerns for the proceeds of Dr. Srivastava's alleged crimes would involve money laundering activities, which are "distinct from health care fraud." *Id.*

To the contrary, in following the money, the financial records of a suspect may well be highly probative of violations of a federal fraud statute. *See Shamy*, 656 F.2d at 958 (concluding that, in mail fraud investigation — in the words of Judge Haynsworth — "large sums of money, and the manner in which those funds were acquired were highly relevant to proof of the scheme to defraud"). Indeed, the health care fraud statute provides that it may be violated by a person who "obtain[s] . . . *money* or property" by means of false or fraudulent pretenses. 18 U.S.C. § 1347 (emphasis added). In the context of a fraud investigation, the financial and accounting records of the suspects — and, as here, records reflecting the overseas transfer of large sums of money by a prime suspect — are potentially compelling evidence that the scheme has been conducted and carried out, and that, in the terms of § 1347, "money or property" has been obtained as the result of false or fraudulent billing practices.[19]

Consequently, and consistent with our conclusion that the Potomac Documents were subject to seizure under the search warrant for the Potomac residence, the Bank of India Transfers were sufficiently designated for seizure by the warrant for the Greenbelt office. As recognized by the district court, the

---

[19]If a false or fraudulent billing scheme has been conducted in connection with a medical practice, multiple federal fraud statutes are potentially implicated. For example, federal fraud offenses that might be pursued on the basis of a factual scenario arising from a health care fraud scheme include, inter alia, mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), tax fraud (26 U.S.C. §§ 7201, 7206), and health care fraud (18 U.S.C. § 1347). Health care fraud is simply one species of such a scheme, which Congress saw fit to combat through its 1996 enactment of § 1347.

Transfers "legitimately appeared to be records of the business." *Srivastava*, 444 F.3d at 396. Furthermore, the possession and transfer of large sums of money — more than $4 million transferred overseas by Srivastava to a bank in India — could readily be deemed evidence of the fraud scheme described in the Affidavit. Simply put, the possession and transfer to another country of such large sums was, even when viewed favorably to Srivastava, very suspicious. And, from the standpoint of the executing officers, it was compelling evidence of a potential health care fraud offense (i.e., obtaining, by false and fraudulent pretenses, the money or property of a health care benefit program). As a result, we also reject the district court's restrictive interpretation of the scope of the warrant for the Greenbelt office, and conclude that the seizure of the Bank of India Transfers was consistent with the Fourth Amendment.

C.

Finally, having determined that the Potomac Documents and the Bank of India Transfers were within the ambit of the search warrants for the Potomac residence and the Greenbelt office, we assess the government's challenge to the blanket suppression of all the seized evidence. In that respect, the district court found that the warrants had been so flagrantly and unconstitutionally executed that a blanket suppression was justified. We have consistently recognized, however, that, "[a]s a general rule, if officers executing a search warrant exceed the scope of the warrant, only the improperly-seized evidence will be suppressed; the properly-seized evidence remains admissible." *United States v. Squillacote*, 221 F.3d 542, 556 (4th Cir. 2000); *see also United States v. Shilling*, 826 F.2d 1365, 1369 (4th Cir. 1987) (holding that "[t]he exclusionary rule does not compel suppression of evidence properly covered by a warrant merely because other material not covered by the warrant was taken during the same search"). We have also recognized that only extraordinary circumstances — such as when "the warrant application merely

serves as a subterfuge masking the officers' lack of probable cause," or if "the officers flagrantly disregard[ ] the terms of the warrant" by "engag[ing] in a fishing expedition for the discovery of incriminating evidence" — will justify the suppression of lawfully seized evidence. *United States v. Uzenski*, 434 F.3d 690, 706 (4th Cir. 2006) (internal quotation marks omitted).

By its Suppression Ruling, the district court determined that a blanket suppression was justified because, inter alia, the executing officers had "approached the searches of Dr. Srivastava's home and offices in a way that flagrantly exceeded the specific limitations of the warrants, and . . . grossly exceeded the scope of the warrants in their execution." *Srivastava*, 444 F. Supp. 2d at 401. The court also concluded that a blanket suppression was warranted, "[e]ven if . . . some of the documents at issue . . . were within the scope of the warrant." *Id.* at 396. Notwithstanding the court's explanation, we are unable to identify any extraordinary circumstances that might support this ruling. And, in any event, our conclusions that the Potomac Documents and the Bank of India Transfers were constitutionally seized substantially undercuts the blanket suppression ruling. For example, the court's finding that Agent Marrero thought "he had limitless power to seize virtually anything from Dr. Srivastava's home and business" is derived from its understanding that Marrero "*intended* to seize personal financial records," *id.* at 397 — an intention not inconsistent with our de novo determination on the scope of the warrants. *See supra* Part III.A-B.

Even assuming — as the district court found — that Agent Marrero believed that the terms of the search warrants were "meaningless," and did not limit his conduct in any way, such an assumption does not support the blanket suppression ruling. *Srivastava*, 444 F. Supp. 2d at 398-99. Simply put, a constitutional violation does not arise when the actions of the executing officers are objectively reasonable and within the ambit of warrants issued by a judicial officer. As a result, the

subjective views of Agent Marrero were not relevant — the proper test is an objective one. *See Maryland v. Macon*, 472 U.S. 463, 470 (1985) ("Whether a Fourth Amendment violation has occurred turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time, and not on the officer's actual state of mind at the time the challenged action was taken." (internal citations omitted)); *see also Martin v. Gentile*, 849 F.2d 863, 869 (4th Cir. 1988) (recognizing that executing officer's actions must be assessed for objective reasonableness "in light of the facts and circumstances confronting him, without regard to his own subjective intent or motivation"). Although we might sympathize with the court's view that Marrero's testimony was disconcerting, his personal opinions were an improper basis for the blanket suppression ruling.[20]

In these circumstances, the district court made errors of law in its blanket suppression of the seized evidence, necessarily abusing its discretion in that regard. *See Koon v. United States*, 518 U.S. 81, 100 (1996); *United States v. Ebersole*, 411 F.3d 517, 526 (4th Cir. 2005) ("By definition, a court abuses its discretion when it makes an error of law." (internal

---

[20]The Suppression Ruling also invoked the government's voluntary return of approximately 80% of the documents and records seized from the Potomac residence, *see supra* note 6, to support its finding that the officers had flagrantly disregarded the scope of the search warrants. *See Srivastava*, 444 F. Supp. 2d at 399 n.16. To the contrary, the voluntary return of property seized under a valid warrant does not give rise to an adverse inference or tend to establish that the initial seizure was unconstitutional. Significantly, the return resulted from an agreement of the parties, apparently obviating the need for a court proceeding under Federal Rule of Criminal Procedure 41(g) (authorizing person aggrieved by unlawful seizure or "by the deprivation of property," to seek property's return). And, Rule 41(g) contemplates that returned property may be admissible in later proceedings, authorizing the court to "impose reasonable conditions to protect access to the property and its use in later proceedings."

quotation marks omitted)). As a result, the blanket suppression ruling also constituted reversible error.[21]

IV.

Pursuant to the foregoing, we vacate the Suppression Ruling and remand for such other and further proceedings as may be appropriate.

*VACATED AND REMANDED*

---

[21]Because we are satisfied that the Potomac Documents and the Bank of India Transfers were within the scope of the search warrants, we need not address the government's final contention — that the evidence generated during the IRS investigation was derived from an independent source.